**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

GRACE UNITED METHODIST
CHURCH,

     Plaintiff-Appellant,

v.

CITY OF CHEYENNE; CITY OF
CHEYENNE BOARD OF
ADJUSTMENT; DOROTHY
WILSON, City of Cheyenne
Development Director; CHEYENNE
CITY COUNCIL,

     Defendant-Appellees,

MOUNTVIEW PARK
HOMEOWNERS' ASSOCIATION,

     Defendant-Intervenor-Appellee,

- - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

     Plaintiff-Intervenor-Intervenor,

THE BECKET FUND FOR
RELIGIOUS LIBERTY,

     Amicus Curiae.

No. 03-8060

---

## OPINION ON REHEARING

---

## Appeal from the United States District Court
## for the District of Wyoming
## (D.C. No. 02-CV-35-B)

---

Samuel Martin Ventola, of Rothgerber Johnson & Lyons LLP, Denver, Colorado, for the Plaintiff/Appellant.

Stephen H. Kline, of Kline Law Office, Cheyenne, Wyoming (Michael D. Basom, Attorney for City of Cheyenne, Cheyenne, Wyoming, on the brief), for the Defendants/Appellees.

Lowell V. Sturgill, Jr., Appellate Staff, Civil Division, Department of Justice, Washington, D.C. (Peter D. Keisler, Assistant Attorney General, Matthew H. Mead, United States Attorney, and Mark Stern, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., with him on the brief), for the Plaintiff-Intervenor, United States of America.

Roman P. Storzer, Anthony Picarello Jr., and Derek L. Gaubatz, filed a brief for Amicus Curiae, The Becket Fund for Religious Liberty.

---

Before **BRISCOE**, **HOLLOWAY,** and **SEYMOUR**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

Grace United Methodist Church (Grace United or Church), a non-profit religious corporation affiliated with the United Methodist Church, filed a civil action pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, and 42 U.S.C. § 1983 against the City of Cheyenne, Wyoming and other affiliated defendants (hereinafter collectively the City). Grace United alleged that defendants' actions in denying it a license to operate a daycare in a residential zone violated (1) RLUIPA by imposing a substantial burden on the Church's exercise of religion; (2) the First Amendment by depriving the Church of its right to free exercise of religion and freedom of speech, assembly, and association; and (3) the Fourteenth Amendment's due process and equal protection clauses by denying the Church use of its property. Mountview Park Homeowners' Association, a non-profit corporation organized by and consisting of homeowners within the Mountain Park Addition of Cheyenne, Wyoming, intervened in the action as a matter of right. *See* FED. R. CIV. P. 24(a)(2). Mountview sought a declaration that the proposed daycare center would violate neighborhood restrictive covenants.

The district court granted summary judgment to defendants on the Church's constitutional claims, *Grace United Methodist Church v. City of Cheyenne*, 235 F. Supp. 2d 1186, 1201-02 (D.Wyo. 2002), and a jury found against the Church under RLUIPA and the restrictive covenants. As a result of the jury's determinations, the district court issued a post-trial judgment enjoining the

-3-

Church from building and operating the daycare center.

We initially affirmed the district court's summary judgment rulings, as well as its associated trial rulings and the jury verdict on the RLUIPA claim. *Grace United Methodist Church v. City of Cheyenne*, 427 F.3d 775 (10th Cir. 2005). We held it unnecessary to address Grace United's additional contentions that Mountview had no standing to intervene, that the district court had no jurisdiction over the restrictive covenant claims, and that in any event the property on which the Church sits is not governed by the covenants. *Id.* at 804. Upon consideration of Grace United's petition for rehearing and petition for rehearing *en banc*, however, we make minor changes to the original opinion and grant panel rehearing to address the issues regarding Mountview's intervention and the restrictive covenants. Our previous opinion, *see Grace United Methodist Church*, 427 F.3d 775, is vacated, and this revised opinion is issued in its stead.

**I**

Grace United is the owner of real property in a low-density residential (LR-1) zone in Cheyenne, Wyoming. The property was deeded to Grace United in 1956 subject to neighborhood covenants, and has been operated as a Methodist church since that time. In March 2001, Grace United sought a license from the City of Cheyenne to operate a 100-child daycare center in the LR-1 zone. The proposed facility would provide care for children newly born to age thirteen,

-4-

would be open to the public regardless of religious affiliation, and would operate eighteen hours a day – from 6:00 a.m. until midnight – seven days a week. Because the applicable Cheyenne zoning ordinance prohibited any entity from operating a daycare with more than twelve children in an LR-1 zone, the City's Development Director, Dorothy Wilson, denied the licence.

Grace United appealed that decision by filing an application for a variance from the LR-1 zoning restrictions. The matter was set for a public hearing in front of the City's Board of Adjustment, the body authorized to hear appeals from adverse zoning decisions. At the hearing, Grace United was represented by counsel and was permitted to present witnesses and evidence. The Church's witnesses testified that the proposed daycare would charge a fee for its services commensurate with fees charged by other daycare facilities in Cheyenne, and would hire caregivers and instructors who were not members of the Church and who may or may not have any religious training. Subsequent to the hearing, the Board of Adjustment unanimously denied the variance on the following bases: (1) the proposed daycare center was not a church, primary or secondary school, or any other similar use permitted within the LR-1 zone, as defined by the Cheyenne Laramie County Zoning Ordinance, and the Board therefore had no authority or discretion to grant the variance; (2) the Church failed to demonstrate that the proposed use was in conformance with all other applicable policies adopted by the City or Laramie County; and (3) the proposed use was incompatible with the

neighborhood and would harm community goals.

Grace United filed this action against the City of Cheyenne, the Board of Adjustment, Dorothy Wilson, in her official capacity as Development Director for the City of Cheyenne, and the City Council, alleging that the Board's decision to deny the variance violated RLUIPA, and the First and Fourteenth Amendments. The City filed a motion to dismiss, which the district court converted into a motion for summary judgment. Grace United responded by filing a motion for partial summary judgment on its RLUIPA claim. The court granted the City's motion in part and dismissed all of the Church's constitutional claims, but it determined there was sufficient evidence to allow the RLUIPA claim to go to trial. Subsequent to the district court's ruling on the summary judgment motions, Mountview intervened to prevent a violation of the covenants of the neighborhood.

The RLUIPA and covenant issues proceeded to jury trial. The jury found that Grace United had failed to prove the proposed operation of the daycare center was a sincere exercise of religion under RLUIPA, and concluded that the daycare center would be in violation of the covenants of the neighborhood. As a result, the district court permanently enjoined Grace United from using its property as a daycare center in violation of Cheyenne's land use regulations and Wyoming's licensing requirements. In so doing, the court determined that the zoning ordinance was enacted pursuant to a compelling governmental interest and was

accomplished by the least restrictive means. This appeal followed.

## II

### *Dismissal of Grace United's Constitutional Claims*

Grace United contends the district court erred by dismissing its constitutional claims. As previously noted, the Church brought claims for relief pursuant to § 1983 alleging that the City, acting under the color of state law, deprived it of its constitutional rights to the free exercise of religion and freedom of speech, assembly, and association in violation of the First Amendment, and due process and equal protection in violation of the Fourteenth Amendment. The district court granted summary judgment to the City on each of these claims.

We review *de novo* the district court's grant of summary judgment. *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1270 (10th Cir. 2001). Summary judgment should be granted if the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Keys Youth Servs.*, 248 F.3d at 1270 (quotation omitted). A mere scintilla of evidence in support of the nonmoving party's position, however, is insufficient to create a genuine issue of material fact. *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997).

*Free Exercise of Religion*

Grace United maintains that the City's action in denying the Church a zoning variance prevents it from engaging in religious instruction on its property. Relying on *Employment Div. v. Smith*, 494 U.S. 872 (1990), the district court held that the City's land use regulations are neutral rules of general applicability which do not substantially burden the Church's exercise of religion. On appeal, Grace United contends the City's zoning ordinances are not neutral laws of general applicability because they allow "case-by-case" exceptions. It also argues that even if the land use regulations at issue are neutral laws of general applicability, the "hybrid-rights" exception to *Smith* applies and requires that the City's zoning regulations satisfy heightened scrutiny. We address each of these arguments in turn.

While the First Amendment provides absolute protection to religious thoughts and beliefs, the free exercise clause does not prohibit Congress and local governments from validly regulating religious conduct. *Reynolds v. United States*, 98 U.S. 145, 164 (1878). Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief. *Smith*, 494 U.S. at 879 (free exercise clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)" (internal quotation omitted)). Thus, a

law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge. *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002). On the other hand, if a law that burdens a religious practice is not neutral or generally applicable, it is subject to strict scrutiny, and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Therefore, our first step in analyzing Grace United's free exercise claim is to determine which level of scrutiny to apply.

Neutral and Generally Applicable Laws

A law is neutral so long as its object is something other than the infringement or restriction of religious practices. *Id.* at 533 (a "law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context"). In the instant case, there is no dispute that the zoning ordinance at issue is neutral on its face. Instead, the parties disagree regarding whether the regulation is "generally applicable."

According to the Church, the ordinance is discriminatorily applied because the regulation permits exceptions on a case-by-case basis.[1] As a result, the

---

[1]Grace United cites the following provisions from Section 41.113 of the City of Cheyenne's zoning code as support for the proposition that the City

(continued...)

-9-

Church argues, the denial of the requested variance should "undergo the most rigorous of scrutiny" before the burdening of religious practice can be justified. Aplt. Br. at 22 (quoting *City of Hialeah*, 508 U.S. at 546). The City counters that Grace United submitted no evidence suggesting the ordinance was enacted due to religious animus or was selectively or discriminatorily applied. Moreover, it claims that it never engaged in "'a pattern of ad hoc discretionary decisions amounting to a system' of individual assessments." Aple. Br. at 16 (quoting *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004)). According to the City, the zoning ordinance simply does not permit anyone, religiously motivated or otherwise, to operate a daycare center in an LR-1 zoned area.

In *Smith*, the Supreme Court noted that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." 494 U.S. at 884 (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986)). We treat this language as the "individualized exemption" exception to *Smith*'s rule regarding neutral and generally applicable laws. *See Axson-Flynn*, 356 F.3d at 1294-95. Based on

———————————

[1](...continued)
allows "case-by-case exceptions":
> The following uses may be permitted by the Board.
> . . .
> (b) Churches
> . . .
> (f) Primary and secondary schools
> (g) Other uses similar to those permitted in this district . . . .

Aplt. Br. at 27-28.

-10-

*Smith* and *City of Hialeah*, the individualized exemption exception inquiry can be summarized as follows: as long as a law remains exemptionless, it is considered generally applicable and religious groups cannot claim a right to exemption; however, when a law has secular exemptions, a challenge by a religious group becomes possible. *See City of Hialeah*, 508 U.S. at 537; *Smith*, 494 U.S. at 884.

"The [Supreme] Court has never explained with specificity what constitutes a 'system' of individualized exceptions." *Axson-Flynn*, 356 F.3d at 1297. The classic example of such a system is the unemployment compensation benefits regime challenged by a Seventh Day Adventist in *Sherbert v. Verner*, 374 U.S. 398 (1963), the source of *Smith*'s individualized assessments carve-out. *See Smith*, 494 U.S. at 884. *Sherbert* involved a plaintiff who refused to work Saturdays due to her religious beliefs and was denied unemployment benefits by government employees who were afforded considerable discretion in assessing applicants' eligibility for benefits. *See Sherbert*, 374 U.S. at 399-402; *see also Smith*, 494 U.S. at 884 ("the *Sherbert* test . . . was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct"). To ensure that individuals do not suffer unfair treatment on the basis of religious animus, subjective assessment systems that "invite consideration of the particular circumstances" behind an applicant's actions, such as the government benefits regime in *Sherbert*, trigger strict scrutiny. *Smith*, 494 U.S. at 884 (quotation omitted).

-11-

Grace United seems to be asking us to adopt a *per se* rule requiring that any land use regulation which permits any secular exception satisfy a strict scrutiny test to survive a free exercise challenge. Consistent with the majority of our sister circuits, however, we have already refused to interpret *Smith* as standing for the proposition that a secular exemption automatically creates a claim for a religious exemption. *See Axson-Flynn*, 356 F.3d at 1297 (a system of individualized exemptions "is one in which case-by-case inquiries are *routinely made*, such that there is an '*individualized governmental assessment of the reasons for the relevant conduct*' that 'invite[s] considerations of the particular circumstances' involved in the particular case" (quoting *Smith*, 494 U.S. at 884) (emphases added)). As the district court correctly observed, several "federal courts have held that land use regulations, i.e., zoning ordinances, are neutral and generally applicable notwithstanding that they may have individualized procedures for obtaining special use permits or variances." *Grace United Methodist Church*, 235 F. Supp. 2d at 1200 (citing cases). Indeed, in the land use context, the Sixth, Seventh, Eighth, and Eleventh Circuits have rejected a *per se* approach and instead apply a fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus, or whether the facts support an argument that the challenged rule is applied in a discriminatory fashion that disadvantages religious groups or organizations. *See, e.g., Civil Liberties For Urban Believers v. City of Chicago*, 342 F.3d 752, 764-5 (7th Cir.

2003) (ordinance permitting churches in all residential areas but requiring special use approval to operate churches in commercial and business areas and limiting church operation in manufacturing areas held neutral laws of general applicability); *First Assembly of God of Naples v. Collier County*, 20 F.3d 419, 423-24 (11th Cir. 1994) (city's ordinance prohibiting homeless shelters in certain areas held neutral and of general applicability because motivated by health and safety concerns, applied to both church and secular group homes and did not completely prohibit operation of homeless shelters); *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 472 (8th Cir. 1991) (zoning ordinance excluding churches and other non-profits from city's central business district had no impact on religious belief and was general law applying to all land use in city). According to these courts, although zoning laws may permit some individualized assessment for variances, they are generally applicable if they are motivated by secular purposes and impact equally all land owners in the city seeking variances. *See, e.g., First Assembly of God of Naples*, 20 F.3d at 423-24.

Although we have not had occasion since *Smith* and *City of Hialeah* were decided to specifically address whether zoning laws with some individualized procedures for obtaining variances are nevertheless generally applicable, circuit precedent is instructive and guides our analysis. In its assessment of the general applicability of Cheyenne's zoning ordinance, the district court specifically relied on *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694 (10th Cir. 1998).

In *Swanson*, a Christian home-schooled student and her parents brought suit against the local school district and its officials, alleging that the district's refusal to allow the student to attend classes part-time violated her rights under the free exercise clause. *Id*. at 696-97. We concluded that the school district's policy against part-time attendance was a neutral law of general applicability:

> On its face, the policy enacted by the school board in this case is neutral and of general application – it applies to all persons who might wish to attend public school on a part-time basis, and prohibits such part-time attendance (*with certain specific exceptions, such as fifth-year seniors and special-education students*). It applies to students who are home-schooled for secular reasons as well as those home-schooled for religious reasons, and it applies to students attending private schools whether or not those private schools are religious or secular in orientation.

*Id*. at 698 (emphasis added). We also held that the school district's part-time attendance policy did not constitute a suspect system of individualized exceptions:

> The school board's policy in this case *does not establish a system of individualized exceptions that give rise to the application of a subjective test*. Instead, *the only recognized exceptions to the full-time-attendance requirement are strict categories of students*, all of whom have one characteristic in common – the state of Oklahoma recognizes them as students for purposes of calculating the amount of financial aid to provide to the school district. Plaintiffs, and all other home-schoolers (religious or secular) who do not meet that requirement, are ineligible for the exception. As we discussed above, *there is no evidence that the exception is in any way based on religious categorization or discrimination*.

*Id*. at 701 (emphases added).

The district court also relied on *Messiah Baptist Church v. County of*

*Jefferson*, 859 F.2d 820 (10th Cir. 1988). In that case, we considered a free exercise challenge to a county's denial of a permit which would have allowed the Messiah Baptist Church to build a church in an agricultural (A-2) zone. *Id*. at 821-23. In holding that the denial of the permit did not violate the Church's right to free exercise, we said:

> the record in our case discloses no evidence that the construction of a house of worship on the property in the A-2 zoning district is integrally related to underlying religious beliefs of the Church . . . . What is important is that *the record contains no evidence that building a church or building a church on the particular site is intimately related to the religious tenets of the church*. At most, the record discloses the Church's preference is to construct its house of worship upon its land.

*Id*. at 824-25 (emphasis added). We concluded with the unequivocal declaration that "[a] church has no constitutional right to be free from reasonable zoning regulations nor does a church have a constitutional right to build its house of worship where it pleases." *Id*. at 826. It was of no consequence that the zoning regulations at issue had the incidental effect of making the church's exercise of religion more expensive because it was compelled to build elsewhere in the county. *Id*. at 825.

In a case particularly apposite to our analysis here, we held that a "rule that is discriminatorily motivated and applied is not a neutral rule of general applicability." *Axson-Flynn*, 356 F.3d at 1294. In *Axson-Flynn*, a Mormon student enrolled in a state university's actor training program brought a § 1983

-15-

suit alleging that her free speech and free exercise rights were violated when she was required to utter certain offensive words while performing a script, in direct contravention to her religious beliefs. *Id*. at 1280-81. We reversed the district court's summary judgment in favor of the university, holding there was a genuine issue of material fact as to whether the script adherence requirement violated the student's free exercise rights. *Id*. at 1299. Importantly, the plaintiff proffered evidence that the script adherence rule was applied to her due to "anti-Mormon" sentiment. *Id*. at 1298-99. For instance, while she was required to adhere strictly to the script, a Jewish student had received permission to miss certain class exercises for religious reasons without suffering adverse consequences. *Id*. at 1298. In fact, the university sometimes granted the plaintiff herself an exemption from the script adherence requirement. *Id*. at 1299. This evidence raised a material fact issue as to whether the university deployed "a pattern of ad hoc discretionary decisions" amounting to a "system of individualized exemptions." *See id*.

The cumulative teachings of *Smith*, *City of Hialeah*, *Swanson*, *Messiah Baptist*, and *Axson-Flynn* support the conclusion that the City's zoning code does not amount to a system of individualized exemptions triggering strict scrutiny. First, and in stark contrast with *City of Hialeah*, there is no evidence in this case suggesting the ordinance was passed due to religious animus. *See* 508 U.S. at 524 (determining that city's asserted interests against cruelty to animals and in

-16-

promoting public health "were pursued only with respect to conduct motivated by religious beliefs"). In *City of Hialeah*, the Santerians' provision of myriad facts demonstrating that the ordinance at issue specifically and purposely targeted Santeria animal sacrifice prompted the Court to apply strict scrutiny. *Id*. at 534-38. Grace United has not made a similar showing here. Indeed, the record is devoid of any indicia that the City enacted the LR-1 zoning regulations with the purpose of restricting or suppressing the free exercise of any religion or religious group, let alone the Methodist Church. The stated objectives of the City's zoning ordinance are, *inter alia*, (1) to promote the health, safety, and general welfare of the citizens of Cheyenne and Laramie county; (2) to lessen congestion in the streets; (3) to create an attractive living and working environment; (4) to prevent the overcrowding of land; and (5) to facilitate provisions for transportation, water, sewage, schools, parks, and other public requirements. *See* Cheyenne City Code § 17.04.010. Grace United failed to proffer any evidence suggesting that the object and purpose of the zoning regulations are anything other than those expressly stated therein.

Second, and inconsistent with the requirements of *Axson-Flynn*, Grace United has not pointed to any evidence to support its conclusory allegation that the City specifically targeted religious groups or the Methodist denomination in its enforcement of the ordinance in this case. The Church does not suggest the Board of Adjustment made any statements amounting to anti-religious or anti-

-17-

Methodist sentiment, or allowed some groups to operate daycare centers in LR-1 zones while denying the Church the same opportunity. In fact, the Board claims it did not have the "authority or discretion" to permit *anyone* to operate a daycare center in a residential zone. Aplt. App., vol. VI at 2527. Grace United makes no attempt to controvert this contention. Moreover, the LR-1 zoning ordinance on its face supports the Board's conclusion that it has no authority to grant a variance for purposes of operating a daycare center in a residential zone. *See* Cheyenne City Code § 17.36.010-0.20; *see also* Aplt. App., vol. VI at 2520 (Board of Adjustment Agenda noting zoning ordinance § 20.010(34)(c) defines daycare center as a "business for profit or otherwise, where twelve or more children are cared for on a regular basis"). The Board's mandatory denial of the Church's variance in this case is thus very different from the government employee's discretionary denial of Ms. Sherbert's unemployment benefits in *Sherbert*, 374 U.S. at 399-402, or the university's allegedly ad hoc and discretionarily enforced script adherence requirement in *Axson-Flynn*, 356 F.3d at 1298-99.

Nor is this a case where the City, by virtue of its zoning laws, "devalues religious reasons for [operating a daycare center] by judging them to be of lesser import than nonreligious reasons." *City of Hialeah*, 508 U.S. at 537-38; *compare Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 364-66 (3rd Cir. 1999) (law not generally applicable where, in contravention to general prohibition of facial hair, police officers allowed to grow beards for

medical reasons but denied same exception for religious reasons), *with First Assembly of God of Naples*, 20 F.3d at 423 (zoning ordinance regulating homeless shelter location and administration generally applicable where applied "to all group homes . . . regardless of their ownership or affiliation.") In the present case, all daycare centers are prohibited from the residential zone where the Church resides. There is no evidence that secular daycare centers have been permitted to operate regardless of the zoning ordinance, while religious organizations like the Church have been denied such an exception. Hence, this is not a controversy in which the City made a "value judgment in favor of secular motivations, but not religious motivations . . . ." *Fraternal Order of Police Newark Lodge No. 12*, 170 F.3d at 365.

While it is true that the Board held a hearing to evaluate the Church's daycare request, we explained in *Axson-Flynn*:

> While of course it takes some degree of individualized inquiry to determine whether a person is eligible for even a strictly defined exemption, that kind of limited yes-or-no inquiry is qualitatively different from the kind of case-by-case system envisioned by the *Smith* Court in its discussion of *Sherbert* and related cases.

*Id*. at 1298. Thus, the fact that the Board decided to hold a hearing to determine whether the Church's use fell into an objective exception category does not lead us automatically to conclude the Board was engaged in a system of subjective individualized assessments. Indeed, we held in *Swanson* that a regulation containing broad, objective exceptions does not establish a subjective system of

-19-

individualized considerations. 135 F.3d at 701. The same logic applies here. Although the City of Cheyenne's zoning ordinance allows for limited objective exceptions in the LR-1 zone (such as churches, schools, and other similar uses) the regulation bars any organization or individual from operating a daycare center in this residential zone, for either secular or religious reasons. The City has not departed from that policy.

Finally, we are not persuaded by Grace United's assertion that the Board's denial of a zoning variance for its proposed daycare operation constitutes more than an incidental burden on religious conduct. As we made clear in *Messiah Baptist Church*, while Grace United has a right to operate a daycare in Cheyenne, it has no right to build its daycare exactly where it pleases. 859 F.2d at 826. "[T]he record contains no evidence that building a [daycare center] or building a [daycare center] on the particular site is intimately related to the religious tenets of" Grace United. *Id*. at 824-25. In fact, as the district court correctly observed,

> Grace United could operate its religious education program in another area of Cheyenne that is properly zoned for such an operation. Or, Grace United could operate its religious education program in its present building, where it has Sunday school facilities, but not upon such a grandiose scale as the day care center it now wishes to construct. If from its present Sunday school of twelve to twenty there had been such great growth and expansion that it was necessary to expand the school to one hundred, then one might not doubt the bona fides of Grace United's church . . . .

*Grace United Methodist Church*, 235 F. Supp. 2d at 1201.

In sum, there was no evidence that the Board ever interpreted the exempt

categories to include certain daycare operations and not others, or that the ordinance was enacted based on religious animus. The fact that the Board consistently concluded it was without discretion to grant variances for daycare facilities in LR-1 zones defeats the argument that it deployed a system of subjective considerations running afoul of the free exercise clause. The First Amendment simply does not entitle the Church to special treatment so that it may operate a daycare exactly where it pleases while no one else can do the same. *See Swanson*, 135 F.3d at 702 ("Nothing in the Free Exercise Clause requires that such special treatment be provided."). Thus, even viewing the evidence in the light most favorable to Grace United, we simply cannot conclude the City was engaging in a pattern of ad hoc discretionary decisionmaking amounting to a system of individual assessments that would trigger strict scrutiny. We hold that Cheyenne's zoning ordinance constitutes a neutral policy of general applicability which does not offend free exercise principles.

Hybrid Rights Exception

Grace United also argues that its claim is not governed by *Smith*'s rational basis exception to general strict scrutiny review of free exercise claims because it is a "hybrid" of both free exercise rights and other constitutionally protected rights. The City contends to the contrary that although the Church has alleged numerous constitutional claims in addition to a free exercise challenge, it has

failed to establish a "colorable claim" of a companion constitutional violation as required by *Swanson* and *Axson-Flynn*. In the alternative, the City maintains that the parameters of the "hybrid rights" doctrine were not clearly established at the time the City acted in this case, and it is therefore entitled to qualified immunity with respect to any hybrid claim.

In support of its core holding that neutral rules of general applicability normally do not raise free exercise concerns, the Court in *Smith* attempted to harmonize free exercise jurisprudence by distinguishing *Smith* from precedent. According to the Court, "[t]he only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections." 494 U.S. at 881. *Smith* thus carved out an exception for "hybrid rights" claims, holding that a party could establish a violation of the free exercise clause even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both the right to free exercise of religion and an independent constitutional right. *Id.*

The hybrid rights doctrine is controversial. It has been characterized as mere *dicta* not binding on lower courts, *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001); criticized as illogical, *Kissinger v. Bd. of Trs.*

-22-

*of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993); and dismissed as untenable.[2]

Courts are also divided on the strength of the independent constitutional right claim that is required to assert a cognizable hybrid rights claim, with a number of courts, including this circuit, expressing the view that a litigant is required to assert at least a "colorable" claim to an independent constitutional right to survive summary judgment. *Swanson*, 135 F.3d at 700; *Axson-Flynn*, 356 F.3d at 1295.

In *Axson-Flynn*, we held that we would "only apply the hybrid-rights exception to *Smith* where the plaintiff establishes a 'fair probability, or a likelihood,' of success on the companion claim." 356 F.3d at 1295. We emphasized that "the *Smith* court itself did not have an expansive standard in mind for a separate hybrid-rights cause of action or it would have found a hybrid-rights claim on the facts before it." *Id*. at 1296 (citing Michael W. McConnell, *Free Exercise Revisionism and the Smith Decision*, 57 U. CHI. L. REV. 1109, 1122 (1990)). As *Axson-Flynn* teaches, the "colorable" inquiry is "fact-driven and must be used to examine hybrid rights on a case-by-case basis." *Id*. at 1297. As

---

[2]*See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 567 (1993) (Souter, J., concurring) ("And the distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule, and, indeed, the hybrid exception would cover the situation exemplified by *Smith*, since free speech and associational rights are certainly implicated in the peyote ritual. But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what *Smith* calls the hybrid cases to have mentioned the Free Exercise Clause at all.").

explained below, while Grace United alleges several constitutional violations, it has not presented a colorable independent constitutional claim.[3]

### *Freedom of Speech and Association*

Grace United claims that its speech and associational rights were violated by the City's denial of the variance to operate the proposed daycare center because the Church is now prohibited from gathering together children to teach its message. The district court dismissed these claims because in its view the City's land use regulations were unrelated to expression and there was no evidence presented that the zoning regulations affected the ability of the Church members to speak, assemble, or associate with one another. We agree.

---

[3]Even assuming the Church could establish a likelihood of success on any of its constitutional claims, the City would be entitled to qualified immunity on any hybrid rights claim. This is so because even "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer [in the defendant's position] that his conduct was unlawful in the situation he confronted." *Id*. at 202. In *Axson-Flynn*, we expressly held that the hybrid rights exception to *Smith*'s rational basis review was not clearly established prior to the *Axson-Flynn* decision in 2004. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1301 (10th Cir. 2004). Any defendant, therefore, whose challenged actions occurred prior to issuance of that opinion was entitled to qualified immunity. *Id*. Thus, regardless of whether Grace United has a fair probability or likelihood of success on any of its independent constitutional claims, the City is entitled to qualified immunity on the Church's hybrid rights claim because the parameters of the doctrine were not clearly established at the time of the City's actions at issue in this litigation.

The First Amendment prohibits government decision makers from "abridging the freedom of speech, . . . or the right of the people peaceably to assemble." U.S. CONST. amend. I. "Content-based restrictions on speech, those which suppress, disadvantage, or impose differential burdens upon speech because of its content are subject to the most exacting scrutiny," *Z.J. Gifts D-2, L.L.C. v. City of Aurora*, 136 F.3d 683, 686 (10th Cir. 1998) (internal citations and quotations omitted), while content neutral regulations that only incidentally burden speech are subject to intermediate scrutiny. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

As explained above, the City's zoning ordinance is neutral and generally applicable, placing Grace United on an equal footing with other religious and non-religious entities seeking to build and operate a daycare center in Cheyenne. It is undisputed that the ordinance does not regulate any form of speech on its face. Moreover, no evidence was presented indicating that the ordinance was passed for the purpose of curtailing or controlling the content of expression. As such, the ordinance is content neutral. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (regulation which "serves purposes unrelated to the content of expression" is considered neutral "even if it has an incidental effect on some speakers or messages but not others"); *see also Gascoe, Ltd. v. Newtown Township*, 699 F. Supp. 1092, 1095 (E.D. Pa. 1988) ("municipality's right to use

its zoning power in the public interest is perhaps the paradigm of [a content neutral] restriction"). Because the challenged zoning ordinance is content neutral, it survives intermediate scrutiny so long as the City can establish that the regulation "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (citing *O'Brien*, 391 U.S. at 377); *Cmty. for Creative Non-Violence*, 468 U.S. at 293.

There is no question that Cheyenne has a substantial interest in regulating the use of its land and that its zoning regulations promote that interest. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1986) (asserting that "a city's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect," quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976) (plurality opinion)). Moreover, the zoning ordinance does not burden any more speech than necessary to further those substantial interests. Not only may Grace United freely disseminate its religious message in the LR-1 zone, but it may disseminate religious speech in any zone in the City. The Church is entitled to operate its daycare center in any one of Cheyenne's 28 zones that is properly zoned for such a facility. Aple. Br. at 17. By invoking the special permit process, Grace United could even attempt to alter the Church property's zone designation to one that permits the operation of daycare facilities. The

-26-

Church made no attempt to take advantage of the established procedures available to special permit applicants. In sum, because the City has an important governmental interest in regulating land use, and its zoning regulations are unrelated to the suppression of speech and do not burden any more speech than necessary, the challenged ordinance survives intermediate scrutiny.

In addition to freedom of speech, the First Amendment also implicitly protects the corresponding freedom to expressive association. *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) ("we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends"); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 295 (1981) (emphasizing "the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues"). The First Amendment protects associational and assembly rights in two distinct ways:

> First, the Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities.

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987). "Of course, the right of association is no more absolute than the right of free

speech or any other right; consequently there may be countervailing principles that prevail over the right of association." *Walker v. City of Kansas City*, 911 F.2d 80, 89 n.11 (8th Cir. 1990).

As previously explained, Cheyenne's zoning ordinance is content neutral and the Church provided no evidence that the challenged regulations were motivated by a desire to curtail protected speech or associational rights. Rather, the evidence on the record suggests that the ordinance was passed for the purpose of regulating traffic, noise and pollution in a residential zone. The land use laws do not interfere with the congregation's right to speak openly and freely or associate with one another. Even in the context of the proposed daycare center, the ordinance only interferes with the congregation's ability to conduct that particular operation at a specific location, and, as previously stated, a "church has no constitutional right to be free from reasonable zoning regulations nor does a church have a constitutional right to build its house of worship where it pleases." *Messiah Baptist Church*, 859 F.2d at 826. The City's zoning regulations are unrelated to the suppression of speech or assembly and do not burden any more speech or associational rights than necessary to further the City's substantial interest in regulating traffic, noise and pollution in a residential zone. Therefore, the fact that Grace United must comply with the City's zoning regulations does not violate its rights to free speech or association.

*Due Process*

Grace United contends the City's zoning ordinance violates its right to due process because the regulation is arbitrary and unreasonable. It argues that there is no basis for the exclusion of religious uses from low density residential neighborhoods, particularly when schools are permitted in such neighborhoods. The district court granted summary judgment for the City on Grace United's due process claim.

In *Messiah Baptist Church*, 859 F.2d at 822, we articulated the "test for measuring the constitutionality of a zoning ordinance" under the Due Process Clause:

> [B]efore a zoning ordinance can be declared unconstitutional on due process grounds, the provisions must be clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare . . . . If the validity of the land classification is "fairly debatable," the legislative judgment must control.

*Id.* (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388, 395 (1926)) (internal citations omitted). As we have already indicated, the ordinance at issue here certainly has a "substantial relation to the public health, safety . . . or general welfare" of Cheyenne. *Id.* We simply cannot conclude that the Board's refusal to grant a variance in a low-density residential zone for a daycare center capable of accommodating one hundred children, eighteen hours a day, seven days a week, is clearly arbitrary and unreasonable. Even "if the validity of the land classification

is 'fairly debatable,' the legislative judgment [of the City] must control." *Id*.


### Equal Protection

Grace United also maintains the district court erred in ruling that the City's ordinance does not violate the equal protection clause. According to the Church, the zoning regulation treats Grace United's proposed land use differently and more onerously than other religious and secular uses of land in violation of the Fourteenth Amendment. The City responds that Grace United's equal protection claim was properly dismissed because the Church failed to proffer any evidence of disparate treatment.

The equal protection clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Equal protection "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Although Grace United asserts that it is treated differently than others, it has not provided even one example of such disparate treatment. In any event, because the Church does not contend it is either a member of a suspect class or was denied a fundamental right, the City's zoning ordinance need only be rationally related to a legitimate government purpose to pass muster under the equal protection clause. *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1213 (10th Cir. 2002).

There can be little doubt that the City's zoning ordinance is rationally related to a legitimate government purpose: the promotion of public health, safety, and general welfare of the citizens of Cheyenne via the control of traffic, noise, and pollution. As articulated by the district court, "[m]unicipal zoning has been a common and accepted exercise of the police power to protect city residents from the effects of urbanization, overcrowding, and encroachment of commercial business for over three-quarters of a century." *Grace United Methodist Church*, 235 F. Supp. 2d at 1207 (citing *Village of Euclid*, 272 U.S. 365). The City has allowed Grace United to operate a Methodist church in a residential zone without interference since 1956. The Church is not seeking similar treatment in its request to operate a large commercial daycare center at that location; rather, it is seeking preferential treatment at the expense of the other landowners in the LR-1 zone. We therefore easily agree with the district court that Grace United failed to state a cognizable equal protection claim.

### III

### *Jury Instructions on Grace United's RLUIPA Claim*

Grace United argued to the jury that the City's refusal to grant the Church's requested variance for the daycare center violated RLUIPA. Relying exclusively on its finding that the proposed daycare operation was not a sincere exercise of religious belief, the jury ruled in favor of the City. Grace United maintains the

jury wrongly reached that conclusion because the district court's jury instructions detailing the requirements of the RLUIPA claim were erroneous as a matter of law.

We review *de novo* whether, as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. *See Reed v. Landstar Ligon, Inc.*, 314 F.3d 447, 450 (10th Cir. 2002); *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1235 (10th Cir. 1999) ("Our concern is to ensure that our review does not leave us with substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations." (internal quotation omitted)). "Even if a review of the instructions, read in isolation from the rest of the trial, did leave this court with a substantial doubt, it would then be necessary to determine whether any error prejudiced" Grace United. *Id.* at 1236; *see also Neder v. United States*, 527 U.S. 1, 15-16 (1999) (applying harmless error test to jury instructions); *Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307, 1310 (10th Cir. 1986) ("Harmless error analysis normally applies in civil cases . . . and it specifically applies to faulty jury instructions." (citing 28 U.S.C. § 2111; FED. R. CIV. P. 61)).

Jury Instruction 19 addressed RLUIPA's requirement that the Church prove an exercise of its sincerely held religious belief was "substantially burdened" by the City's denial of the requested variance. Aple. Supp. App. at 83. The

instruction informed the jury that Grace United could not base its claim on religious activities unless those activities were "fundamental" to its religion. *Id*. Specifically, the court instructed the jury that protected religious exercise under RLUIPA was restricted to "conduct or expression that manifests some tenet of the institution's belief" and curtails its "ability to express adherence to its faith," or denies it "reasonable opportunities to engage in those activities that are *fundamental* to the institution's religion."[4] Aplt. App., vol. V at 2262 (emphasis added). Grace United objected to Instruction 19 and asked the court to substitute the word "important" for "fundamental," which the court refused to do. *Id*. at 2151-52. The Church contends Instruction 19 erroneously overstated its burden because RLUIPA does not require the religious activity that is substantially burdened by the land use regulation at issue to be "fundamental."

The City, on the other hand, maintains that Instruction 19 correctly articulates the constitutional substantial burden test. It further asserts that even

---

[4]Jury Instruction 19 read as follows:

A government regulation "substantially burdens" the exercise of religion if the regulation: (1) significantly inhibits or constrains conduct or expression that manifests some tenet of the institutions belief; (2) meaningfully curtails an institution's ability to express adherence to its faith; or (3) denies an institution reasonable opportunities to engage in those activities that are *fundamental* to the institution's religion.

Thus, for a burden on religion to be "substantial," the government regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution is insufficient.

Aple. Supp. App. at 83 (emphasis added).

-33-

assuming Instruction 19 was erroneous, it was harmless because it was but one of several instructions setting forth the elements that Grace United was obligated to prove under RLUIPA, and the other instructions did not include the extra and allegedly erroneous requirement that the intended activity be fundamental to religious exercise.

RLUIPA sets up a strict scrutiny standard for the implementation of land use regulations. In essence, a land use regulation cannot "substantially burden" "religious exercise" unless the government can show the regulation furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a).[5] The statute also contains a

---

[5]In relevant part, this provision reads as follows:
§ 2000cc. Protection of land use as religious exercise.
  (a) Substantial burdens.
    (1) General rule. No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--
      (A) is in furtherance of a compelling governmental interest; and
      (B) is the least restrictive means of furthering that compelling governmental interest.
    (2) Scope of application. This subsection applies in any case in which . . .
      (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make,

(continued...)

nondiscrimination provision, which prohibits land use regulations that either disfavor religious uses relative to nonreligious uses or unreasonably exclude religious uses from a particular jurisdiction. *Id*. § 2000cc(b).[6] Although RLUIPA provides a very broad definition of "religious exercise, " *id*. § 2000cc-5(7)(A) (religious exercise "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief"), it fails to define "substantial burden." Nevertheless, RLUIPA's legislative history reveals that "substantial burden" is to be interpreted by reference to the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq*., and First Amendment

---

[5](...continued)
> individualized assessents of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a).

[6]

> (b) Discrimination and exclusion.
> (1) Equal terms. No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
> (2) Nondiscrimination. No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.
> (3) Exclusions and limits. No government shall impose or implement  a land use regulation that--
>> (A) totally excludes religious assemblies from a jurisdiction; or
>> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

*Id*. § 2000cc(b).

jurisprudence. *See* 146 CONG. REC. 7774-01, 7776 ("The term 'substantial burden' as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise."); *see also Civil Liberties for Urban Believers*, 342 F.3d at 760-61.

The City relies on *Thiry v. Carlson*, 78 F.3d 1491, 1495 (10th Cir. 1996), to illustrate that Instruction 19 represents a correct statement of the substantial burden test. The question in *Thiry* was whether the plaintiffs' rights under RFRA would be violated if a parcel of their property containing the grave of their stillborn daughter was taken for public highway purposes, necessitating the relocation of the gravesite. *Id*. at 1493. Concerning the definition of substantial burden, we noted that *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), was controlling. *Thiry*, 78 F.3d at 1495. The Supreme Court stated there that the incidental effects of otherwise lawful government programs "which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute substantial burdens on the exercise of religion. *Id*. (quoting *Lyng*, 485 U.S. at 450-51).

We acknowledged in *Thiry* our statement in *Werner v. McCotter*, 49 F.3d 1476 (10th Cir. 1995),

> that to exceed RFRA's "substantial burden" threshold, government regulation – "must significantly inhibit or constrain conduct or

-36-

expression that manifests some central tenet of . . . [an individual's] beliefs; must meaningfully curtail [an individual's] ability to express adherence to his or her faith; or must deny [an individual] reasonable opportunities to engage in those activities that are *fundamental* to [an individual's] religion."

*Thiry*, 78 F.3d at 1495 (quoting *Werner*, 49 F.3d at 1480) (emphasis added)).

This quotation from *Werner* mirrors the definition of substantial burden adopted by the district court in Instruction 19. Recognizing the tension between the standard articulated in *Lyng* and the test laid out in *Werner*, we noted that *Werner*'s status as a prisoner case "may explain why [the court] failed entirely to address the . . . 'substantial burden' standard in *Lyng*," but we also concluded that "[t]he reasoning of *Werner* . . . is too broad to permit a prisoner/nonprisoner distinction." *Id.* We nevertheless found it unnecessary to reconcile *Werner*'s language with *Lyng* because we agreed with the district court that the Thirys did not establish a substantial burden under any plausible reading of the statute. *Id.* Thus, while we acknowledged the different and conflicting language used to define substantial burden in *Lyng* and *Werner*, we neither endorsed the *Werner* standard nor resolved the issue in *Thiry*.

Grace United, relying on our decision in *Kikumura v. Hurley*, 242 F.3d 950, 960-61 (10th Cir. 2001), contends the definition of religious exercise was deliberately relaxed in RLUIPA and that a limitation of religious exercise to "fundamental" activities does not apply to RLUIPA claims. *Kikumura* involved a cause of action brought by a federal prisoner seeking injunctive relief on the basis

-37-

that prison officials had violated his First and Fifth Amendment rights as well as RFRA by denying him pastoral visits from his Christian minister. *Id*. at 953-55. In ruling that the pastoral visits requested by the prisoner were protected activities under RFRA, we stated:

> The term "exercise of religion" was previously defined in RFRA as "the exercise of religion under the First Amendment to the Constitution." *See* 42 U.S.C. § 2000bb-2(4) (1999). RLUIPA amended RFRA, however, so that "exercise of religion" now means "religious exercise, as defined in [42 U.S.C. §] 2000cc-5." *Id*. § 2000bb-2(4). "[R]eligious exercise" is defined in 42 U.S.C. § 2000cc-5(7)(A) to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Plaintiff does not claim the requested pastoral visits were required by his religious beliefs. Under the definition of "religious exercise" in 42 U.S.C. § 2000cc-5(7)(A), however, *a religious exercise need not be mandatory for it to be protected under RFRA*. Plaintiff maintains that his desire to study Christianity and practice Christian prayer necessitated visits by Christian pastors, and that Reverend Rickard was particularly appropriate because of his experience as a Christian missionary in Japan, Plaintiff's native country. Pastoral visits of this nature are protected activities under RFRA, particularly in light of the new definition of "exercise of religion" adopted in RLUIPA. *See id*. § 2000cc-5(7)(A).

*Id*. at 960-61 (emphasis added). In other words, whatever the substantial burden test required prior to the passage of RLUIPA, the statute substantially modified and relaxed the definition of "religious exercise." As such, Instruction 19 improperly articulated the substantial burden test, regardless of what this court said in *Werner*, and arguably in *Thiry*, by requiring the religious activities that were substantially burdened to be "fundamental." The district court's decision to modify the phrase "activities" with "fundamental" in the Jury Instruction 19 was

-38-

therefore erroneous.

The question remains whether the error was harmless.  Our answer turns on whether the district court's erroneous jury instruction was prejudicial to Grace United.  *Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1212 (10th Cir. 2002) ("[a]n error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial" (quotation omitted)).  The City contends that even if Instruction 19 erroneously defined the substantial burden

test, any error was harmless because Instructions 17,[7] 18,[8] and 20[9] provided an accurate description of the law of RLUIPA for the jury and did not include the extra (and erroneous) requirement that the activity at issue be fundamental to religious exercise.

While it is true that the district court correctly articulated the definition of "religious exercise" in Instruction 17, a reasonable juror could have been misled

---

[7]Instruction 17 read as follows:
    The term "religious exercise" as used in the Religious Land Use and Institutionalized Persons Act *includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief. The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise* of the person or entity that uses or intends to use the property for that purpose.
Aple. Supp. App. at 81 (emphasis added).

[8]Instruction 18 read as follows:
    In order to prove the essential elements of Plaintiff's claim under RLUIPA, the burden is on Plaintiff to establish by a preponderance of the evidence each of the following:
        First: The City of Cheyenne's land use regulation, or the Board of Adjustment's application of that land use regulation, imposes a substantial burden on Grace United Methodist Church's exercise of religion;
        Second: Grace United Methodist Church's operation of the child care or day care center is [a] sincere exercise of religion; and
        Third: Grace United Methodist Church is a religious assembly or institution.
*Id*. at 82.

[9]Instruction 20 read as follows:
    A religious belief is "sincere" if it is truly held and religious in nature.
*Id*. at 84.

by the court's erroneous articulation of the substantial burden test provided moments later in Instruction 19. Nevertheless, we are convinced a reasonable juror could not have been misled *to Grace United's detriment* by Instruction 19 because the jury found that the Church failed to prove it was engaged in a *sincere* exercise of religion.[10] As a consequence, the substantial burden issue became irrelevant. Because the jury was never misled about the legal requirements for finding a sincere religious belief, we conclude with confidence that Instruction 19's error had no impact whatsoever on the outcome of the proceedings in the district court. *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir. 1998) ("Evidence admitted in error can only be prejudicial if it can be reasonably concluded that . . . without such evidence, there would have been a contrary result."). It necessarily follows that the erroneous description of RLUIPA's substantial burden test in Instruction 19 was harmless as a matter of law.

---

[10]After reading the jury instructions, the court addressed each section of the special verdict form for the jury. Significantly, the first question the jury was required to answer on the verdict form was whether Grace United had proven "by a preponderance of the evidence that [its] proposed operation of the child care or day care center is a sincere exercise of religion." Aplt. App., vol. V at 2265. The court instructed the jury that if they determined the answer to this first question was no, "that would end the matter and [they should] just date and sign the verdict." *Id.* After deliberations, the jury did just that. *Id.* at 2275.

-41-

# IV

## *Admissibility of Bishop Brown's Letter*

Subsequent to the Board of Adjustment's decision to deny Grace United's request for a variance to operate the daycare center, the Church's pastor, Jon Laughlin, sent a letter to Bishop Warner Brown, the presiding Bishop over the Rocky Mountain and Yellowstone Conferences of the United Methodist Church. Aplt. App., vol. II at 812-14. The letter and attached resolution from Grace United detailed the history of the proposed daycare project and recounted the proceedings at the variance hearing before the Board. *Id*. at 813. It also requested "financial, legal and spiritual" assistance from the Bishop and the Conference in pressing RLUIPA litigation. *Id*. at 814.

Bishop Brown responded to Pastor Laughlin with a letter dated May 18, 2001. *Id*. at 815. In that correspondence, the Bishop opined that Grace United's proposed daycare center "seems to look more like a commercial venture and less like a religious function, thereby justifying the government's compelling interest of limiting traffic, noise and congestion in a residential neighborhood." *Id*. He also indicated that he was concerned about the dearth of facts demonstrating religious discrimination:

> if the constitutionality of RLUIPA were to be tested, I would want
> the case to have facts which demonstrate more clearly that a church
> in the Conference was being discriminated against or excluded from
> a city. In this case, Grace is allowed to operate in the neighborhood,
> and even expend [sic] its sanctuary and children's education wings.
> The only limitation on its request is the denial of a variance to

-42-

operate a daycare center, a more traditional commercial venture.

*Id*.

During discovery, Grace United provided copies of the letter to the City without any assertion of privilege. The City listed the letters as trial exhibits and deposed Bishop Brown at his office in Denver, Colorado on May 13, 2003. Aplt. App., vol. IV at 1799. During his deposition, Bishop Brown testified that his May 18, 2001, letter to Pastor Laughlin accurately expressed the concerns he had at the time he sent the letter. *Id*. at 1804. Bishop Brown further stated that he no longer held those views of the proposed project and now considered the daycare to be "an important ministry" of the Methodist Church. *Id*. at 1806.

Prior to trial, Grace United filed a motion in limine seeking to exclude the Bishop's letter. According to the Church, Bishop Brown was not a spokesman or a representative of Grace United Methodist Church and, as a result, the contents of his letter could not be admitted as statements of a party opponent. The district court disagreed and denied the Church's motion to exclude based on its finding that Bishop Brown was a "superintending authority" of Grace United. *Id*., vol. III at 1118. The court held the letter admissible pursuant to the admission against interest exception to the hearsay rule.[11] Both the City and Grace United listed

_____

[11]The City submits that the court decided to admit the Bishop's letter pursuant to Federal Rule of Evidence 804(b)(3). Aple. Br. at 36. The district court admitted the letter as an "admission against interest," without specifically articulating which federal rule it was implicating. Aplt. App., vol. III at 1118.

(continued...)

-43-

Bishop Brown as a witness in their final pretrial memoranda and the Church called the Bishop in its case-in-chief by way of his videotaped deposition. *Id*., vol. IV at 1796-97. Grace United contends the district court's admission of the letter constitutes reversible error.

Grace United contends Bishop Brown's letter was inadmissible and its admission as evidence constitutes reversible error because the Bishop is not a representative of the Church and his opinions in the letter were not rationally based on his perceptions. We review a district court's decision to admit evidence for abuse of discretion. *United States v. Jenkins*, 313 F.3d 549, 559 (10th Cir.

---

[11](...continued)
Unavailability of the declarant is a prerequisite to the exception from the hearsay rule of an admission against interest, FED. R. EVID. 804(a), and the parties stipulated that Bishop Brown was physically "unavailable" to provide live testimony during the jury trial. A declarant, however, is considered available for purposes of the exception under Rule 804(b)(3) if the declarant's deposition testimony can be taken for use at trial. *See* FED. R. EVID. 804(a)(5). Thus, a deposed declarant such as Bishop Brown can never be "unavailable" for purposes of an exception under Rule 804(b)(3). As a result, we assume here that the district court actually relied on Rule 801(d)(2), which deems an admission by a party-opponent to be nonhearsay. *See, e.g., Big Apple BMW of N. Am., Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1374 (3d Cir. 1992) (noting Rule 801(d)(2) "is designated as an admission against interest"); *United States v. Johnson*, 971 F.2d 562, 574 (10th Cir. 1992) (referring to Rule 801(d)(2) as an "admission against interest"); *see also* DAVID F. BINDER, HEARSAY HANDBOOK § 35-1, at 35-6 (4th ed. 2001) ("An admission of a party-opponent is normally contrary to the interest of the declarant, but there is no requirement that this be so."); JOSEPH M. MCLAUGHLIN ET AL, WEINSTEIN'S FEDERAL EVIDENCE § 801.30[1], at 801-48 (2d ed. 2005) (party admissions under Rule 801(d)(2) may, but are not required to be, against interest). In any event, we may affirm the district court on any basis supported by the record. *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1165 (10th Cir. 2004).

2002).  "[W]e will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment."  *Id*. (citations omitted).

Federal Rule of Evidence 801(d)(2) defines the admission by a party opponent exclusion to the hearsay rule as follows:

> The statement is offered against a party and is (A) the party's own statement, in *either an individual or a representative capacity* or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) *a statement by a person authorized by the party to make a statement concerning the subject*, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

FED. R. EVID. 801(d)(2) (emphases added).  Bishop Brown testified in his deposition that as Bishop of the Rocky Mountain Conference, he is the "general superintendent" with "assigned presidential responsibility over an episcopal area where [he] serve[s] as the president of the corporation . . . at the annual conference level."  Aplt. App., vol. IV at 1800.  The "episcopal area" over which Bishop Brown presides "includes the state of Utah, the state of Colorado, and the eastern portion of the state of Wyoming."  *Id*. at 1800-01.  With regard to his relationship with Grace United, Bishop Brown testified in relevant part as follows:

> A: (Bishop Brown): *As a bishop I assign the pastors and essentially am responsible for supervising their work within the terms of the church's understanding.  Each local church is given a certain degree of autonomy, but the annual conference becomes sort of the*

-45-

*beneficiary or the trust beneficiary. In the event a local church goes out of business, the property and assets of that local church would then revert to the annual conference on behalf of the whole.*

Q: (City's attorney): Your relationship to the Grace United Methodist Church in Cheyenne is what?

A: Well, me personally?

Q: Correct or the conference.

A: The conference. Grace United Methodist Church is a member of the United Methodist Church and a member of the Rocky Mountain Conference. That means they get to elect laypersons to attend and are voting members of the Rocky Mountain Conference for policy making decisions. *They – Rocky Mountain Conference through me, the bishop, assigns their pastor, and that pastor is a voting member of the Rocky Mountain Conference.* Essentially Rocky Mountain Conference – traditionally it was the church for pastors, and it's separate from – *a pastor isn't a member of a particular congregation, but they are a member of that entity, the annual conference.* The local church as a part of its agreement to be in the faith covenant of being a United – faithful United Methodist is to work cooperatively with other churches in ministry and outreach, and things like that. So they cooperate with other Methodist churches. *They're supervised by me or the district superintendent I assign to supervise the work of the pastor and the church. They're expected to follow our principles and ethics and legislative format for doing their work.*

*Id.* at 1801 (emphases added). In other words, in the United Methodist Church, bishops are administrative superintendents of the church. *Id.* Among their duties, they are responsible for appointing clergy to serve local churches as pastor, for performing ordinations, and for safeguarding the doctrine and discipline of the Church. *See id.*

To the extent that Bishop Brown has the ability to assign and remove local

-46-

pastors at will within his conference and to supervise their work, he is necessarily

Pastor Laughlin's manager or, as aptly depicted by the district court, Grace

United's "superintendent." Indeed, Bishop Brown testified that the Conference

provides Grace United with financial support in general and, under his

supervision and direction, provided funds to the Church to wage the instant

lawsuit. *Id.* at 1804. Moreover, should Grace United go "out of business" due to

financial mismanagement or any other reason, the property and assets of the

Church would revert to the Rocky Mountain Conference and to Bishop Brown's

control. *Id.* at 1801. Based on this evidence, the district court's finding that

Bishop Brown was a "superintending authority" and, as a result, a representative

of or a party authorized to speak for Grace United, was not clearly erroneous.

Nor was the court's decision to admit the Bishop's letter under Rule 801(d)(2) an

abuse of discretion.

Grace United also argues that Bishop Brown's letter was inadmissible

because his opinions in the letter were not rationally based on his perceptions.[12]

_____

[12]Pursuant to Rule 701, a witness who is not an expert may offer opinion
testimony only when it is
> (a) rationally based on the perception of the witness, (b) helpful to a
> clear understanding of the witness' testimony or the determination of
> a fact in issue, and (c) not based on scientific, technical, or other
> specialized knowledge within the scope of Rule 702.
Thus, Rule 701 permits the admission of lay opinion testimony provided that it
meets two criteria: a rational basis in perception and helpfulness. "The
perception requirement stems from F.R.E. 602 which requires a lay witness to
have first-hand knowledge of the events he is testifying about so as to present

(continued...)

While opinion testimony admitted pursuant to Rule 701 "requires a lay witness to have first-hand knowledge of the events he is testifying about so as to present only the most accurate information to the finder of fact," *United States v. Hoffner*, 777 F.2d 1423, 1425 (10th Cir. 1985), an admission of a party opponent needs no indicia of trustworthiness to be admitted. *United States v. Pinalto*, 771 F.2d 457, 459 (10th Cir. 1985) ("The district court erroneously viewed trustworthiness as a separate requirement of admission under Section 801(d)(2)(A)."). Thus, as the court said in *Jewel v. CSX Transp., Inc.*, 135 F.3d 361, 365 (6th Cir. 1998), "[t]he admissibility of statements of a party-opponent is grounded not in the presumed trustworthiness of the statements, but on 'a kind of estoppel or waiver theory, that a party should be entitled to rely on his opponent's statements.'" (quoting *United States v. DiDomenico*, 78 F.3d 294, 303 (7th Cir. 1996)).

We have expressly held that an admission of a party opponent may be introduced in evidence even though the declarant lacked personal knowledge of the matter asserted. *Smedra v. Stanek*, 187 F.2d 892, 894 (10th Cir. 1951) (stating that "[a]dmissions do not come in, on the ground that the party making them, is speaking from his personal knowledge, but upon the ground that a party will not make admissions against himself unless they are true" (quotation

---

[12](...continued)
only the most accurate information to the finder of fact." *United States v. Hoffner*, 777 F.2d 1423, 1425 (10th Cir. 1985).

-48-

omitted)); *accord Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 96 (3d Cir. 1999) ("Admissions by a party-opponent need not be based on personal knowledge to be admitted under Rule 801(d)(2)."); *Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 8-9 (1st Cir. 1986). Quoting from the Notes of Advisory Committee on the Proposed Rules, we provided in *Pinalto* the source and explanation for the Rule 801(d)(2) exception from the personal knowledge requirement:

> "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule [Citations omitted]. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and *from restrictive influences of the opinion rule and the rule requiring first-hand knowledge*, when taken with the apparently prevalent satisfaction with the results, calls for a *generous* treatment of this avenue of admissibility." [Emphasis supplied.]

771 F.2d at 459 (emphasis added). Thus, any contention that Bishop Brown's letter was inadmissible under Rule 801(d)(2) because his opinions in the letter were not rationally based on his perceptions lacks merit.

In any event, Bishop Brown's extensive experience with the United Methodist Church and its religious beliefs includes his service as an ordained minister for thirty years, during which he occupied such diverse posts as local pastor, district superintendent, and council director. Aplt. App., vol. IV at 1801. As previously explained, the Bishop currently serves in the elected position of

presiding Bishop of a conference encompassing several states. *Id*. at 1800-02. There is little doubt that his capacious employment with the Methodist Church has provided him myriad opportunities to observe firsthand the church's policies and practices with respect to its various religious-based projects. Consequently, his opinion concerning the religious versus the more traditionally commercial nature of the proposed daycare center likely was well within his own education, observation, and recollection, and based on what he had perceived over time.

It is also worth noting that Bishop Brown had the right, which he exercised in his May 2003 deposition testimony, to contradict and explain the admissions he made in the May 2001 letter. As the court noted in *Murrey v. United States*, 73 F.3d 1448 (7th Cir. 1996), "[p]eople usually don't make damaging admissions unless they are true. Usually, but not always. People sometimes do make mistaken admissions, which is why an extrajudicial admission . . . is not conclusive on the issue admitted. But it is evidence." *Id*. at 1455. Grace United itself called Bishop Brown via his deposition for the purpose of bolstering its claim that the daycare center was an important ministry of the Methodist Church. At the minimum, therefore, the City was entitled to impeach that testimony with the Bishop's prior inconsistent statements. It is also important to note the Bishop testified that the opinions contained in his letter were accurate at the time the letter was drafted. Aplt. App., vol. IV at 1804. Hence, the admission of the letter was at most cumulative to the opinion testimony offered by Grace United. For

the aforementioned reasons, we conclude the Bishop's statements asserting that the daycare center appeared to be more of a commercial venture and less of a religious function were not inadmissible hearsay.

Grace United further contends that if Bishop Brown is a representative of and authorized to speak for the Church for purposes of Rule 801(d)(2), the statements in his letter constitute protected work product. However, any work product objection was waived by Grace United via production. *See, e.g., Simmons, Inc. v. Bombardier, Inc.*, 221 F.R.D. 4, 8 (D.D.C. 2004) ("The work-product privilege may be waived by the voluntary release of materials otherwise protected by it."); *see also Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 704 (10th Cir. 1998) ("[A] litigant cannot use the work product doctrine as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion."). Moreover, work product protection only applies to attorneys' or legal representatives' mental impressions, conclusions, opinions, or legal theories authored in anticipation of litigation. FED. R. CIV. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947); *see also Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) ("The party asserting a work product privilege as a bar to discovery must prove the doctrine is applicable. . . . A mere allegation that the work product doctrine applies is insufficient."). The Bishop's letter was drafted more than a year prior to the initiation of the

instant litigation by an individual who insists that he had no role in the decision to proceed with this litigation.

On the other hand, we disagree with the City's contention that the Bishop's opinions regarding what constitutes a compelling state interest under RLUIPA are admissible under Rule 701.[13] It is uncontroverted that Bishop Brown has no legal training or expertise. Consequentially, he is entirely unqualified to pontificate on legal questions, and statements he made to that effect constitute irrelevant hearsay and, thus, were inappropriately admitted into evidence. The district court's erroneous admission of the Bishop's legal opinions, however, was harmless. As explained in the preceding section, the jury did not reach the question whether the City's purpose in enacting and enforcing the zoning ordinance constituted a compelling state interest because it found that the proposed daycare center was not a sincere exercise of religion. Since the jury never reached the issue on which Bishop Brown opined, the error could not have altered the outcome of the proceedings or otherwise affected the substantial rights of Grace United. *Frontier Refining Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 705 (10th Cir. 1998) (holding that trial court's decision to admit evidence should only be overturned if "it affected the substantial rights of the parties").

**V**

---

[13]*See infra* note 11.

_____ *Admissibility of Various Other Contested Evidentiary Items*

Along with the Bishop Brown's letter, the Church also objected to several exhibits the district court deemed admissible, including (1) petitions allegedly signed by persons claiming to be neighbors of Grace United and objecting to the daycare center, aplt. app., vol. VI at 2546; (2) a staff report allegedly prepared by employees of the City, *id.* at 2520; (3) the minutes from a neighborhood meeting hosted by Grace United, *id.* at 2552; and (4) statements made opposing the daycare center in community meetings, *id.*, vol. V at 2030-32. Because the RLUIPA claim raised issues concerning both the Church's religious beliefs as well as the City's secular motives, the district court ruled that the above enumerated exhibits were relevant and admissible. When the issue of whether to grant a new trial "hinges on the admissibility of evidence," we review the "admission of the evidence for abuse of discretion." *Minshall v. McGraw Hill Broad. Co., Inc.*, 323 F.3d 1273, 1283 (10th Cir. 2003) (quoting *Sanjuan*, 160 F.3d at 1296).

The City advances several theories to support the admission of these documents. First, it contends the documents were relevant evidence of the motives of the City in adopting and enforcing its zoning ordinance. It also maintains that had the Church successfully established the City's zoning ordinance substantially infringed on its sincerely held religious beliefs, the exhibits would have been probative as to whether the City had a compelling

governmental interest in the enactment and enforcement of its land use regulations. Finally, the City submits that the staff report, minutes, and petitions were part of the official record of the City and, as such, fall into the business records exceptions to the hearsay rule pursuant to Rule 803(8).

We need not address these contentions because even if the exhibits are inadmissible, the district court's decision to enter them into evidence was harmless. The dispositive issue for the jury in this case was whether the daycare center constituted a sincere exercise of the Church's religious beliefs. Grace United does not even allege that the documents at issue in any way undermined its claim that the daycare operation was a sincere exercise of religion. Indeed, it struggles to explain exactly how it was prejudiced by the introduction into evidence of these particular exhibits. In a conclusory fashion, Grace United alleges nothing more than the admission of these items "was clearly prejudicial, [because they] portrayed Appellees in the 'best light,' and Grace United Methodist Church in the 'worst light' as going against the desires of the majority of the neighbors." Aplt. Rep. Br. at 29. As previously emphasized, even evidence "admitted in error can only be prejudicial if it can be reasonably concluded that . . . without such evidence, there would have been a contrary result." *Sanjuan*, 160 F.3d at 1296. Because Grace United has provided us with no basis for reasonably concluding that the jury would have reached a contrary result had the objected-to exhibits not been admitted by the district court, any

error in admitting them was harmless.


# VI

## *Mountview Park Homeowners' Association and Restrictive Covenants*


### *Rule 24(a)(2) Intervention*

Grace United contends that the district court erred in permitting Mountview Homeowner's Association to intervene and raise the applicability of the restrictive covenants. Grace United does not claim the district court erred in its application and analysis of the Rule 24(a)(2) factors when it granted Mountview permission to intervene as a matter of right.[14] Instead, the Church argues that Mountview had no standing to intervene and that the district court lacked jurisdiction over Mountview's intervention claim. We therefore limit our intervention discussion to these two issues.


<u>Standing</u>

_____

[14]Under Rule 24(a)(2),

> [u]pon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

FED. R. CIV. P. 24(a)(2).

Grace United maintains Mountview has no rights under the covenants and therefore no standing to intervene in this action. According to the Church, the association lacks standing to enforce the covenants because it neither has enforcement rights pursuant to original covenant documents nor is it a direct successor to the interests of a party to the covenant. We are not convinced. Supreme Court authority makes clear

> that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Mountview satisfies these conditions.

First, there is no question that the individual members of the association have standing in their own right to sue to enforce the covenants. Wyoming treats "restrictive covenants as contractual in nature, and they are to be interpreted in accordance with the principles of contract law." *Anderson v. Bommer*, 926 P.2d 959, 961 (Wyo. 1996). As the Wyoming Supreme Court has explained: "if the covenant runs with the land, it binds the owner whether or not he had knowledge of it, whereas if it does not run with the land, the owner is bound only if he has taken the land with notice of it." *Streets v. J M Land & Developing Co.*, 898 P.2d 377, 379 (Wyo. 1995) (citation omitted). The covenants governing the Mountview Park Addition were filed in June 1952 and declare that they "run with

the land," and are binding on all parties to the covenants, "their heirs, successors, personal representatives, grantees and assigns, and all persons claiming under them." Aplt. App. vol. VI, at 2571-72. The covenants also direct that if any owner of real property within the development violates or attempts to violate the covenants, "it shall be lawful for any other *person or persons* owning any real property situated in said development or subdivision to prosecute any proceedings at law or in equity against the persons violating or attempting to violate . . . any of the . . . covenants." *Id.* at 2572-73 (emphasis added). Hence, the covenants are specifically enforceable by any record owner of real property situated in the development, *see Anderson*, 926 P.2d at 962 ("As a general rule, a restrictive covenant may be enforced by one [for] whose benefit it was made."), against any other record owner of real property situated in the development, even if that record owner obtained legal title to its property without actual notice of the restrictions. The individual members of the association thus have standing to seek an enforcement of the covenant restrictions.

Nor has any contest been raised as to the remaining *Hunt* requirements. Mountview was created for the purpose of protecting the covenant rights of those who live in the subdivision, and the association sought to protect those rights in the instant suit. Moreover, a determination regarding whether the Church's proposed daycare center would violate the restrictive covenants did not mandate participation of the individual members in the suit. No individualized proof was

required to address Mountview's request for a declaration that a daycare center would run counter to the restrictive covenants. The issue therefore, could be "properly resolved in a group context." *Hunt*, 432 U.S. at 344. In sum, Mountview had standing to intervene in this law suit.

## Jurisdiction

Grace United also asserts the district court erred in permitting Mountview to intervene because the court lacked jurisdiction over the association's restrictive covenant claim, a state law issue. In making this argument, the Church relies on language from *United States v. Martin*, 267 F.2d 764 (10th Cir. 1959), and *Bantel v. McGrath*, 215 F.2d 297 (10th Cir. 1954). Neither case provides support for the Church's position.

In *Martin*, this court noted that the motion to intervene there claimed both permissive intervention and intervention as a matter of right. 267 F.2d at 768-69. We then said that a counterclaim "may be *permissively* joined if [it and the main action] present common questions of law and fact, *provided of course the counterclaim rests upon its own jurisdictional footing*." *Id.* at 769 (emphasis added). In *Bantel*, on the other hand, this court held that intervention as a matter of right was inappropriate because the parties seeking to intervene had done so after the conflict at issue in the underlying action had become moot. 215 F.2d at 299. Alternatively, we held intervention improper because "Rule 24(a) . . . does

not grant the right of intervention to try an issue outside the authorized scope of [the statutory] proceedings, for it was not intended to enlarge upon the jurisdiction of the court." *Id.* at 299. However, the underlying lawsuit was an action by the Attorney General of the United States against a bank to enforce an administrative order under the Trading with the Enemy Act, which had vested in the United States property belonging to German nationals. We said that the issue the intervenors were attempting to raise, namely, the validity of the underlying vesting order, was not within the scope of the enforcement proceeding in which "the determination that the property is enemy-owed is conclusive, even though erroneous." *Id.*

Grace United relies on the quoted language from *Martin* and *Bantel* regarding lack of jurisdiction to contend that intervention should be limited to those controversies in which the district court possesses independent jurisdiction over both the underlying claim and the claims raised by the intervenor. The Church's jurisdictional argument misses the mark.

First, since *Martin* and *Bantel* were decided, statutory jurisdictional rules were enacted expressly providing a court may exercise supplemental jurisdiction over intervention claims that are sufficiently related to the main claim over which the court has federal question jurisdiction. 28 U.S.C. § 1367(a).[15] Thus, section

_____

[15]On the other hand, the statute set limits on supplemental jurisdiction when the district court's subject matter jurisdiction is based on diversity. 28 U.S.C. §
(continued...)

1367(a) provides:

> the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. *Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.*

*Id.* (emphasis added). In *Kelley v. Michaels*, 59 F.3d 1055 (10th Cir. 1995), we

described the import of § 1367(a) as follows:

> Congress included in the Judicial Improvements Act of 1990 a provision, 28 U.S.C. § 1367, clarifying and codifying the federal courts' supplemental jurisdiction. The impetus, in part, was a recognition that recent Supreme Court decisions had cast doubt on the authority of federal courts to hear some claims within supplemental jurisdiction. *See* H.R.Rep. No. 101-734, 101st Cong., 2d Sess. 28, *reprinted in* 1990 U.S.C.C.A.N. 6873-76; *see also Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (denying jurisdiction by a plaintiff against additional, nondiverse defendant over a claim related to the underlying federal action) . . . . Section 1367 intended to supplant the related and somewhat overlapping concepts of ancillary and pendent jurisdiction, principally reinstating pre-*Finley* case law with some additional clarification. H.R.Rep. No. 101-734, *supra* at 28-29. The legislative history indicates that "*[i]n federal question cases*, [§ 1367] broadly authorizes the district courts to exercise supplemental jurisdiction over additional claims, including claims involving the joinder of additional parties." *Id.* at 28.

*Id*. at 1058 (emphasis added). *See also* JAMES WM. MOORE ET AL., 6 MOORE'S

FEDERAL PRACTICE § 24.22 [1], at 24-82 (3d ed. 2005) ("The federal

---

[15](...continued)
1367(b). *See* JAMES WM. MOORE ET AL., 6 MOORE'S FEDERAL PRACTICE § 24.22 [2], at 24-82 (3d ed. 2005); *see generally* Karen Nelson Moore, *The Supplemental Jurisdiction Statute: An Important but Controversial Supplement to Federal Jurisdiction*, 41 EMORY L.J. 31 (1992).

supplemental jurisdiction statute . . . codified the judicial doctrines of pendent and ancillary jurisdiction."); David D. Siegel, *Practice Commentary*, reprinted in 28 U.S.C.A. § 1367, at 829-31 (West 1993) (discussing doctrines of pendent and ancillary jurisdiction).

Prior to the adoption of § 1367, commentary and case law regarding supplemental jurisdiction made clear that when a party was entitled to intervene *as a matter of right*, the court had pendent jurisdiction over the intervenor's claim and no independent jurisdictional basis was required. *See, e.g., Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 375 n.18 (1978); *Int'l Paper Co. v. Inhabitants of the Town of Jay, Maine*, 887 F.2d 338, 346 (1st Cir. 1989); *Curtis v. Sears, Roebuck & Co.*, 754 F.2d 781, 783 (8th Cir. 1985); 7C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1917, at 464 (2d ed. 1986). Conversely, as we said in *Martin*, *permissive* intervention did require that the district court possess independent jurisdiction over the intervenor's claim. WRIGHT ET AL., *supra*, at 464-65; *Security Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995); *Greene v. United States*, 996 F.2d 973, 978 (9th Cir. 1993); *Int'l Paper Co.*, 887 F.2d at 346; *Moosehead Sanitary Dist. v. S.G. Phillips Corp.*, 610 F.2d 49, 52 n.5 (1st Cir. 1979).

Here, the district court permitted Mountview to intervene as a matter of right under Rule 24(a)(2). Thus, no independent jurisdictional basis for

Mountview's intervention was required.[16]  Under 28 U.S.C. § 1367(a), the district court properly exercised jurisdiction over Mountview's restrictive covenant claim.

### *Applicability of the Covenants*

Finally, we are not persuaded by Grace United's contentions on the merits that the restrictive covenants do not apply to it and that the district court erred by submitting to the jury the question of whether the Church's proposed daycare center violated the terms of the covenants.

Grace United is bound by the covenants.  In its attempt to argue otherwise on appeal, it points out that it is not located on a "lot," which is the reference most of the covenants use, but rather is located on a block.[17]  It asserts that the covenants only place restrictions on lot use, without giving any indication as to how property on a block must be utilized.  For example, Paragraph A of the covenants states that all *lots* in the neighborhood shall be for single-family residential dwellings.  *See* Aplt. App., vol. II at 590.  Grace United argues that its block is not subject to any restrictions regarding how the Church property located

---

[16]Our decision in *Bantel v. McGrath*, 215 F.2d 297 (10th Cir. 1954), is distinguishable as holding that intervention itself was inappropriate.  It was not at all concerned with whether supplemental jurisdiction existed over a pendent claim once intervention was granted.

[17]Paragraph G of the covenants states that a church may be built on block 12, but if it is not, then the block shall be divided into eight lots.  *See* Aplt. App., vol. II at 591.

thereon might be used.

The Church is wrong. While Paragraph A of the covenants dictates that all lots in the neighborhood shall be used for residential purposes, Paragraph E places additional use restrictions on all land in the subdivision whether that land is described as a lot or block. It directs that "[n]o noxious or offensive trade or activity shall be carried on upon *any lot or block* nor shall anything be done thereon *which may be or become an annoyance or nuisance* to the neighborhood." Aplt. App., vol. II at 591 (emphasis added). The Church is thus clearly barred from engaging in any activity that could become a nuisance to the neighborhood.

Whether the proposed daycare center would constitute a nuisance was clearly a fact question for the jury to decide. The jury was instructed as follows:

> The Defendant/Intervenor Mountview Park Homeowners' Association has the burden of proof to prove that restrictive covenants restrict the plaintiff's use of its property and that the plaintiff's proposed child care or daycare center violates restrictive covenants on the property.
> . . .
> It is for you to determine whether the plaintiff is bound by restrictive covenants and whether such covenants would be violated by the plaintiff's operation of the child care or daycare center.
> You're instructed that a nuisance is a class of wrong which arises from an unreasonable, unwarranted or unlawful use by a person of his own property, working obstruction or injury to the right of another.

App. App., vol. V at 2263-64. The jury was also given a special verdict form on which it was required to answer the following question: "Do you find by a preponderance of the evidence that Grace United Methodist Church's proposed

-63-

child care or daycare center violates the covenants applicable to that block of property, fifth filing, block 12." *Id.* at 2275. The jury answered this question in the affirmative. *Id.*

The jury's findings are supported by the evidence. In light of Paragraph E of the covenants, which barred any activity "which may be or become an annoyance or nuisance to the neighborhood," *id.*, vol. II at 591, the jury was instructed that "a nuisance is a class of wrong which arises from an *unreasonable, unwarranted or unlawful* use by a person of his own property, working obstruction or injury to the right of another." *Id.*, vol. V at 2264 (emphasis added). This instruction was in complete accord with Wyoming law. *See, e.g., Brown v. Johnston*, 85 P.3d 422, 430 (Wyo. 2004) ("We have defined nuisance as a class of wrongs which arise from an unreasonable, unwarranted, or unlawful use by a person of his own property, working an obstruction or injury to the right of another.") (internal quotations and citation omitted); *Edgcomb v. Lower Valley Power & Light, Inc.*, 922 P.2d 850, 859 (Wyo. 1996) (same); *Hein v. Lee*, 549 P.2d 286, 291 (Wyo. 1976) (same). The jury's conclusion in regard to the Church's RLUIPA claim, *see Grace United Methodist Church*, 427 F.3d at 797 n.10, was that Grace United's proposed operation of the daycare center was not a sincere exercise of its religion. The evidence supported the conclusion that it was instead, as asserted by the City and Mountview, a commercial activity barred by the specific zoning restrictions for the neighborhood. Because the Church's

proposed daycare would have been unlawful under the City's zoning restrictions, the jury could reasonably conclude it would constitute a nuisance in accordance with the instructions provided to it by the court.

## VII

For the foregoing reasons, we grant in part Grace United's petition for rehearing and **AFFIRM**.  Grace United's petition for rehearing *en banc* was circulated to all the circuit judges of the court in regular active service.  No judge has requested a poll, and the suggestion for rehearing en banc is therefore denied.