**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHRISTIAN HERITAGE
ACADEMY, a private corporation,

     Plaintiff-Appellant,

v.

OKLAHOMA SECONDARY
SCHOOL ACTIVITIES
ASSOCIATION, a not-for-profit
association,

     Defendant-Appellee.

No. 04-6342

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-2003-0056-L)**

---

Micheal Salem of Salem Law Offices, Norman, Oklahoma (William D. (Bill)
Graves, Oklahoma City, Oklahoma, and Chris Box, Oklahoma City, Oklahoma,
with him on the briefs), for Plaintiff-Appellant.

Mark S. Grossman (Clyde A. Muchmore, and Mary H. Tolbert with him on the
brief) of Crowe & Dunlevy, a Professional Corporation, Oklahoma City,
Oklahoma, for Defendant-Appellee.

---

Before **BRISCOE, McWILLIAMS,** and **McCONNELL**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiff Christian Heritage Academy ("Christian Heritage") filed this action pursuant to 42 U.S.C. § 1983 claiming, in pertinent part, that defendant Oklahoma Secondary School Activity Association's ("OSSAA's") membership requirements for nonpublic schools violated the Equal Protection Clause. The district court granted summary judgment in favor of OSSAA. Christian Heritage now appeals from that ruling. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.

I.

OSSAA is Oklahoma's state-organized school activities association, which regulates interscholastic activities. For athletics, OSSAA determines athletic divisions, sets eligibility rules, and holds state play-offs and championships.

Christian Heritage is a private religious school in Del City, Oklahoma, and well-known for its eight-man football team. Since it is not an OSSAA member, Christian Heritage cannot participate in the state-organized activities association or compete in the state-organized play-offs or championships. Christian Heritage has applied for OSSAA membership on two occasions, but OSSAA denied its applications, both of which failed to garner majority approval from OSSAA member schools. Christian Heritage has satisfied all other membership requirements, except obtaining majority approval.

*OSSAA's admission requirements for nonpublic schools*

OSSAA has 471 member schools, and twelve of its members are nonpublic

-2-

schools (ten of which are private schools and two are Indian schools). Of the

private schools, eight are located in suburban areas, while two are in rural areas.

The OSSAA Constitution, which governs membership in the association,

applies different application procedures for public and nonpublic schools:

> a. Membership in the Association shall be open to public schools . . . and other schools as approved by the members of the Association.
>
> b. Any secondary school desiring to become a member of the Association is to file with the Executive Secretary a resolution, . . . authorizing such membership . . . . Upon submitting the resolution, and all entry fees or other reports required by the Association, a public school . . . shall be admitted to membership. All other schools must be approved by a majority vote of the existing membership and, if approved, must submit all entry fees and reports required to establish membership.

OSSAA Const. art. III, § 1 (emphases added), App. Vol. 1, at 57. To be admitted

into OSSAA, public schools merely apply, but nonpublic schools must garner

approval by majority vote from OSSAA members.

When a nonpublic school applies for membership, OSSAA members vote

for or against the application. Importantly, however, OSSAA members are

provided with, and are subject to, no standards or guidelines in voting. Instead,

the ballot simply describes the geographic area where students are immediately

eligible for athletics in the nonpublic applicant school by reason of residence.[1]

---

[1] Whenever a nonpublic school applies for membership, it must designate a geographic area within which students enrolled in the school would be considered immediately eligible for athletics by reason of residence. Under the Education

(continued...)

-3-

OSSAA's Rule 8 lists the geographic areas for nonpublic schools that are admitted. See OSSAA Rule 8, § 1 (b), App. Vol. 1, at 72. Thus, when a nonpublic school is admitted into OSSAA, Rule 8 is amended to include its geographic area for eligibility. Pursuant to OSSAA's Constitution, any amendment to the rules of the association, including Rule 8, must be approved by a majority vote of the member schools. OSSAA Const. art. VII, § 2, App. Vol. 1, at 63. Thus, on the same ballot and in one vote, member schools vote simultaneously whether to admit a nonpublic school, and whether to amend Rule 8 to establish its geographic area.

*Christian Heritage's first application*

On March 4, 1998, Christian Heritage applied to join OSSAA. Simultaneous with Christian Heritage's first application to OSSAA, there was controversy surrounding admission of nonpublic schools to OSSAA membership.

On March 16, 1998, Perry Adams, the Superintendent of Inola Public Schools, sent a letter and petition to all member schools. Adams' letter stated that it "has become necessary for us to examine some problems, perceived or real,

[1](...continued)
Open Transfer Act, a student may attend a school district in which a student is not a resident, provided that the receiving district authorizes the transfer. Okla. Stat. tit. 70, § 8-103.2; Okla. Stat. tit. 70 § 8-101.2. If a student transfers to a school district in which he is not a resident, he cannot compete in athletics for one year, unless the transfer is due to a bona fide change of residence by his parents, or he can demonstrate a legitimate hardship. Okla. Stat. tit. 70, § 8-103.2; OSSAA Rule 8, § 1(b), App. Vol. 1, at 72.

that have arisen" given the "growing number of non-public schools asking and receiving acceptance" to OSSAA. App. Vol. 3, at 506. Adams' petition listed five items concerning "participation and classification of non-public schools in OSSAA sanctioned activities," and it mentioned Christian Heritage by name:

> (1) Non-public schools['] ability to offer financial aid (scholarships) or work student and work assistance programs.
>
> (2) Non-public schools['] district size. (i.e. On March 26, 1998 the OSSAA will be mailing ballots to membership schools allowing them the opportunity to vote to accept or not to accept Christian Heritage Academy into the OSSAA. Christian Heritage Academy has designated their district boundary lines to include all of Moore Public Schools district and all of Midwest City/Del City Public Schools district, which have a combined total 9-12 membership of 9,670 students which are divided into four 6A schools and one 5A school. If voted in, Christian Heritage Academy would be a 2A school with a 9-12 membership of 218 students).
>
> (3) Non-public student transfer restrictions as related to public schools student transfer restrictions (i.e. under current public school law a transfer student must be accepted by both receiving and sending district. Non-public schools have no such restrictions).
>
> (4) Non-public school membership audits for verification of OSSAA classification.
>
> (5) Percentage of students who participate in OSSAA activities in public schools as related to percentage of students participating in non-public schools.

Adams' Petition, App. Vol. 3, at 507. Adams asked member schools to return the petition to him "[i]f you agree that some of these items need to be addressed." Id. at 506. Seventy-two member schools returned petitions to Adams.

Given the increased controversy concerning the admission of nonpublic

-5-

schools into OSSAA, on March 25, 1998, the OSSAA Board of Directors discussed "concerns that recently surfaced with public schools regarding OSSAA non-public schools." App. Vol. 3, at 503.

On March 26, 1998, OSSAA mailed ballots to all member schools to vote on Christian Heritage's application. The ballot defined Christian Heritage's school boundaries as the Mid-Del and Moore School Districts, which are two suburban school districts near Oklahoma City. The ballot stated that Christian Heritage had 218 students in grades 9-12, which would classify it as a 2A school in athletics. The ballot had no space to allow a member school to explain its vote for or against Christian Heritage's application, and the ballot instructed "PLEASE DO NOT ENCLOSE OTHER CORRESPONDENCE WITH BALLOT." App. Vol. 3, at 505. Christian Heritage prepared a letter advocating its membership, which was attached to each ballot. The postmark deadline for the ballots was April 13, 1998.

With 184 schools voting against the application, and 153 schools voting for it, OSSAA denied Christian Heritage's application in April 1998 because it failed to garner majority approval. Danny Rennels, OSSAA's Executive Secretary, acknowledged that before the "first vote on Christian Heritage, it had become evident that admission of non-public schools to membership had become more controversial than in the recent past." Rennels Aff. ¶ 12, App. Vol. 6, at 1094. On April 20, 1998, Superintendent Adams forwarded Executive Secretary Rennels

the seventy-two petitions from member schools who had indicated that the participation and classification of non-public schools in OSSAA sanctioned activities needed to be addressed.

In November 1998, the OSSAA's Board of Directors created the Nonpublic and Public School Relations Committee ("Committee"). The Committee would investigate member schools' concerns about nonpublic schools, and it included public and nonpublic school representatives, including Adams. Some public schools voiced concerns at area meetings regarding criteria for enrollment, admission standards, scholarships and recruiting, size of districts for nonpublic schools, and even distorted enrollment numbers because nonpublic schools "do not have special education students" included in their average daily membership. App. Vol. 3, at 532.

The Committee rejected each of the proffered reasons for denying membership to nonpublic schools in a Special Report, which was mailed to all OSSAA members in January 1999. The Committee emphasized that OSSAA rules prohibit recruiting or providing scholarships for athletics, and that the transfer rule effectively resolves concerns about a nonpublic school designating its geographic boundary. The Committee concluded that "communication seems to be the real problem" because the "fact that the OSSAA Handbook of Rules and Regulations applies to all schools, public and non-public, doesn't seem to be fully grasped." App. Vol. 3, at 522. Doyle Greteman, Superintendent of Lindsey

Schools, expressed that "many of those concerns [about nonpublic schools] have been unfounded." App. Vol. 3, at 522. The Committee concluded that "there is a shortage of FACTS amongst the OSSAA membership and inadequate knowledge of the OSSAA Administrator's Handbook." App. Vol. 3, at 532.

The Committee observed that member schools had no uniform reason for their negative feelings toward nonpublic schools. In a report to OSSAA's Board of Directors and Executive Secretary Rennels, the Committee Chairman concluded that OSSAA members believed that nonpublic schools have an "unfair advantage in competition[,] [but] . . . . [t]here is not a great deal of consistency with regard to exactly what it is that makes the field unlevel." App. Vol. 3, at 530. The Chairman further stated that "there is not an openness to private schools in our association," and he observed "some strong negative feelings" toward nonpublic schools. App. Vol. 3, at 530.

The Committee Chairman described a "consistent theme that placed ALL non-public schools into an unfavored group status," and he observed "a distrust of non-public school officials and their programs." App. Vol. 3, at 530, 532. The Committee Chairman could identify no reason why member schools would deny membership to a nonpublic school:

> If we are not seeing a definite bias and prejudice, then we are
> certainly hearing the frustration of those who perceive inequities.
> We have yet to be presented with empirical evidence of inherent
> advantages for non-public schools. Therefore we must question why
> any school who would submit to the OSSAA Rules and Regulations

would be denied membership.

App. Vol. 3, at 530. The Committee Chairman wondered whether voting schools "have any facts or information on which to make a responsible vote." Id. at 531.

*Christian Heritage's second application*

In August 1999, Christian Heritage again applied for membership. Christian Heritage reduced the size of its proposed geographic area, because Executive Secretary Rennels said that the large geographic area may have been the reason why member schools denied its application. Christian Heritage limited its geographic area to the Mid-Del School District, which is the district in which Christian Heritage is physically located. Notwithstanding this reduction, or the member schools' receipt of the Committee's Special Report, the second application failed by a higher margin than the first application: 188 votes against membership, and 113 votes in favor.

In November 2000, Christian Heritage Headmaster Ralph Bullard spoke to OSSAA's Board of Directors, asking if there were alternatives to the majority vote process for admission to membership. OSSAA admitted "being aware that some member school representatives [we]re opposed to admitting any more non-public secondary schools located in metropolitan areas into OSSAA membership, in the belief that such schools may have distinct advantages in competing with other member schools with similarly sized student populations." Answer ¶ 22, App. Vol. 1, at 159. Despite the belief of OSSAA's member schools that non-

-9-

public schools had advantages, the Committee concluded that the "notion [wa]s a canard." App. Vol. 3, at 535.

According to Executive Secretary Rennels, athletic "success of several of the non-public school members in the years that Christian Heritage was applying for membership was a significant factor in the voting on Christian Heritage's applications for membership in 1998 and 1999." Rennels Aff. ¶ 23, App. Vol. 6, at 1097. In particular, successful football and basketball teams from nonpublic schools "contributed to the perception that non-public schools in more highly populated areas enjoyed an unfair advantage over public schools that would fall within the same classifications." Id. ¶ 14, App. Vol. 6, at 1094.

*Procedural history*

On January 10, 2003, Christian Heritage filed this action pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983, seeking declaratory and injunctive relief for alleged constitutional violations. In February 2003, Christian Heritage amended its complaint, alleging that OSSAA violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the Free Exercise Clause of the First Amendment.

The parties filed cross motions for summary judgment, but Christian Heritage did not advance any First Amendment argument in its motion for summary judgment. On September 23, 2004, the district court granted summary judgment for OSSAA. The district court applied rational basis scrutiny to

Christian Heritage's equal protection claim, concluding that OSSAA's requirement that nonpublic schools designate a geographic area was a rational basis for distinguishing between public and nonpublic schools. The district court concluded that Christian Heritage could not identify any protected liberty or property interest at stake, and it dismissed Christian Heritage's due process claim. Finally, the district court held that Christian Heritage abandoned its First Amendment claim, and Christian Heritage has not challenged this ruling on appeal.

II.

Christian Heritage contends that OSSAA's requirement of majority approval for admission of nonpublic schools violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and that OSSAA violated the Equal Protection Clause in denying its membership application.

We review the district court's grant of summary judgment de novo, applying the same legal standard as the district court. E.g., Grace United Methodist Church v. City of Cheyenne, 427 F.3d 775, 782 (10th Cir. 1999). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Cross motions for summary judgment are to be treated separately; the denial of one does not

require the grant of another." Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979). Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts. Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000). Where the facts are not in dispute and the parties only disagree about whether the actions were constitutional, summary disposition is appropriate. See Fed. R. Civ. P. 56(c).

At the outset, we agree with the district court and conclude that OSSAA is subject to the Fourteenth Amendment because it is a state actor. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Assoc., 531 U.S. 288, 298-99 (2001). OSSAA's conduct constitutes state action because of the "persuasive entwinement of public institutions and public officials in its composition and workings." Id. at 298. OSSAA members are 98 percent public schools, which is a larger percentage than that in Brentwood Academy. See 531 U.S. at 298-99 (concluding that the athletic association was a state actor where 84 percent of its members were public schools). All fourteen of OSSAA's current directors are public school employees, and Oklahoma has authorized OSSAA to determine athletic eligibility and hold play-off games. See Okla. Stat. tit. 70, § 8-103.2. OSSAA is subject to the Fourteenth Amendment.

*A. Due Process Clause*

Although Christian Heritage argued before the district court that OSSAA

-12-

violated the Due Process Clause, Christian Heritage has failed to preserve its due process argument on appeal. While Christian Heritage lists its due process claim as an issue in its opening brief, it discusses its due process claim in less than one page of its brief in a section entitled "Introduction to Argument," and it provides no other argument and no citations. Aplt. Br. at 27-28. Moreover, Christian Heritage conceded that it has not identified a property or liberty interest at stake, which is necessary for advancing a due process claim. See, e.g., Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ., 232 F.3d 1334, 1341 (10th Cir. 2000).

Where an appellant lists an issue, but does not support the issue with argument, the issue is waived on appeal. E.g., Garrett v. Selby, Connor, Maddux & Janer, 425 F.3d 836, 841 (10th Cir. 2005); Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Jordan v. Bowen, 808 F.2d 733, 736 (10th Cir. 1987) (holding that the appellant abandoned his due process argument on appeal). "Scattered statements in the appellant's brief are not enough to preserve an issue for appeal." Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1133 n.4 (10th Cir. 2004). We conclude that Christian Heritage has waived its due process argument.

*B. Equal Protection Clause*

Christian Heritage advances two equal protection arguments. First, Christian Heritage maintains that Article III, Section 1 of the OSSAA Constitution violates the Equal Protection Clause because public high schools are

-13-

admitted upon application, but nonpublic schools must obtain majority approval from OSSAA member schools for admission. See OSSAA Const. art. III, § 1. Second, Christian Heritage challenges OSSAA's decisions denying its membership applications, but admitting other nonpublic high schools.

The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The parties agree that rational basis scrutiny applies, as Christian Heritage has not argued that OSSAA's conduct targets a suspect class or violates a fundamental right. See, e.g., Schutz v. Thorne, 415 F.3d 1128, 1135 (10th Cir. 2005).

*1. Equal Protection challenge to Article III, Section 1 of Constitution*

Christian Heritage claims that the requirement in Article III, Section 1 of OSSAA's Constitution that nonpublic schools obtain majority approval for admission violates the Equal Protection Clause because public schools are admitted automatically upon application. We hold that, although OSSAA has identified legitimate purposes for distinguishing between public and nonpublic schools in regards to their admission to the organization, the requirement in OSSAA's Constitution that nonpublic schools obtain majority approval in order to be admitted is not rationally related to any of those legitimate purposes.

The government violates the Equal Protection Clause when it "treats someone differently than another who is similarly situated" without a rational

-14-

basis for the disparate treatment.  Crider v. Bd. of County Comm'rs of Boulder,

246 F.3d 1285, 1288 (10th Cir. 2001) (internal quotation marks omitted).  Under

rational basis scrutiny, we will uphold OSSAA's requirement of majority

approval so long as it is rationally related to a legitimate government purpose or

end.  See, e.g., Vacco v. Quill, 521 U.S. 793, 799 (1997); E.SPIRE Commc'ns,

Inc. v. N.M. Pub. Regulation Comm'n, 392 F.3d 1204, 1209 (10th Cir. 2004).

We begin by noting that the district court failed to apply rational basis

scrutiny to OSSAA's requirement of majority approval in Article III, Section I of

OSSAA's Constitution.  Instead, the district court mistakenly applied rational

basis scrutiny to OSSAA's Rule 8 and Article VII, Section 2 of OSSAA's

Constitution.  Rule 8 lists the geographic areas for the nonpublic schools that

have been admitted.  Article VII, Section 2 of OSSAA's Constitution requires

majority approval for changes in the Rules of the Association.  See OSSAA

Const. art. VII, § 2, App. Vol. 1, at 63.  The district court concluded that

requiring nonpublic schools to obtain approval by a majority vote to amend Rule

8, which lists the geographic areas, did not violate the Equal Protection Clause

because OSSAA had a rational basis for requiring nonpublic schools to designate

a geographic area.  We need not determine whether the district court was correct

in this regard because Christian Heritage has challenged only the referendum

requirement for nonpublic schools in Article III, Section 1.

Article III, Section 1 of OSSAA's Constitution provides that OSSAA

-15-

membership is open to public schools "and other schools as approved by the members of the Association." App. Vol. 1, at 57. In turn, OSSAA's Constitution sets forth different application procedures for public and nonpublic schools. Public schools, upon filing a resolution and paying its fee, "shall be admitted to membership." Id. In contrast, nonpublic schools "must be approved by a majority vote of the existing membership and, if approved, must submit all entry fees and reports required to establish membership." Id.

In determining whether this referendum requirement violates Christian Heritage's Equal Protection rights, we begin by concluding that Christian Heritage is similarly situated to at least some of the public schools that have been admitted to OSSAA. It is uncontroverted that OSSAA's Constitution and rules, including its transfer rule and the prohibition on athletic scholarships and recruiting, apply equally to public and nonpublic schools. Further, it is uncontroverted that Christian Heritage agreed to comply with OSSAA's rules if admitted. Thus, we define public schools similarly situated to Christian Heritage as having comparable average daily membership and being located near large cities. See Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998); Jacobs, Visconsi & Jacobs Co. v. Lawrence, 927 F.2d 1111, 1119 (10th Cir. 1991). Christian Heritage, if admitted into OSSAA, would have been a Class 2A school with a membership of 218 students. Christian Heritage is located in Del City, which is outside of Oklahoma City. Other public schools that have been

admitted to OSSAA are similarly situated to Christian Heritage in all material respects.  For example, Luther High School is a Class 2A public school located outside of Oklahoma City with a membership of 251.  Crooked Oak High School is a Class 2A public school in Oklahoma City with a membership of 229.  Hominy High School and Mounds High School are located outside of Tulsa, and they are in Class 2A with memberships of 224 and 228, respectively.

In addition to establishing that it is similarly situated to at least some of the public school members of OSSAA, Christian Heritage has also demonstrated disparate treatment.  Specifically, public schools are admitted to OSSAA without having to obtain approval from a majority of OSSAA's members, while nonpublic schools, even if they satisfy all other requirements for admission, must obtain majority approval from the members of the association.

Thus, the only remaining issues are whether OSSAA's requirement of majority approval for nonpublic schools has a legitimate purpose, and, if so, whether it was reasonable for OSSAA to believe that use of this separate classification for nonpublic schools would promote that purpose. See Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 668 (1981); Powers v. Harris, 379 F.3d 1208, 1215 (10th Cir. 2004), cert. denied, 125 S. Ct. 1638 (2005); Save Palisades FruitLands v. Todd, 279 F.3d 1204, 1213-14 (10th Cir. 2002).  As to the rational relationship between the classification and purpose, we require only that the legislative body (in this case, OSSAA itself)

-17-

"could rationally have decided" that its classification "might foster" its purpose. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466 (1981) (emphasis omitted). In most cases, the classification and purpose are rationally related. But "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985); Copelin-Brown v. N.M. State Personnel Office, 399 F.3d 1248, 1255 (10th Cir. 2005). We are not constrained by the parties' arguments concerning legitimate state purposes. See Powers, 379 F.3d at 1217.

When there is an inadequate or a nonexistent connection between the classification and purpose, the Supreme Court has invalidated the classification under rational basis scrutiny. See Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, 488 U.S. 336, 344-45 (1989); City of Cleburne, 473 U.S. at 432, 449; Hooper v. Bernarillo County Assessor, 472 U.S. 612, 621-22 (1985) (observing that the statute's distinction is "not rationally related to the State's asserted legislative goal"); Williams v. Vermont, 472 U.S. 14, 25-27 (1985); Zobel v. Williams, 457 U.S. 55, 62-65 (1982); U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 536 (1973); U.S. Dep't of Agric. v. Murry, 413 U.S. 508, 513-514 (1973); Linsdey v. Normet, 405 U.S. 56, 77-79 (1972).

Similarly, in Copelin-Brown, we struck down a separate classification for disabled versus non-disabled persons under rational basis review. 399 F.3d at

-18-

1255-56. We recognized that easing administrative burdens "can be a reason sufficient to withstand rationality review." Id. at 1255 (internal quotation marks omitted). But we concluded that the state's refusal to give disabled persons post-termination hearings was not rationally related to the interest in reducing administrative burdens because the asserted interest was too attenuated. Id. at 1255. Where the record "fail[ed] to present any facts showing that the regulation in question eased administrative burdens," we concluded that the distinction between disabled and non-disabled persons was arbitrary and irrational. Id. at 1255. In addition, we concluded that the suggested goal of preventing stigma was irrational. Id. at 1255-56.

Here, OSSAA justifies the requirement of majority approval for nonpublic schools because nonpublic schools must declare a geographic area for eligibility purposes. The geographic area is listed in Rule 8, and OSSAA's Constitution requires majority approval to amend Rule 8. See OSSAA Const. art. VII, § 2, App. Vol. 1, at 63. But OSSAA conflates its constitutional provision in Article III, Section 1, which requires majority approval for admission, with Rule 8, which requires nonpublic schools to declare a geographic area. Christian Heritage does not challenge Rule 8. Moreover, OSSAA did not deny Christian Heritage's application because it designated a geographic area that was too large. Christian Heritage reduced its geographic area in its second application and designated only the district in which it was physically located, but OSSAA still rejected its

-19-

application.

Aside from Rule 8 and designation of a geographic area, OSSAA suggests several other possible purposes for the classification between public and nonpublic schools: "preserving equitable competitive opportunities, preventing exploitation of student-athletes, and preserving a balance between academics and athletics." Aple. Br. at 23. We agree that these are legitimate government purposes. Indeed, we can conceive of additional legitimate reasons that an association such as OSSAA might have for distinguishing between public and nonpublic schools, including eliminating or reducing the advantages that nonpublic schools may have in recruiting, the awarding of scholarships, transferring for athletic purposes, and distorted average daily membership because of fewer students with disabilities. See Powers, 379 F.3d at 1217 ("[W]e are not bound by the parties' arguments as to what legitimate state interests the statute seeks to further.").

That leaves, however, the question of whether it was reasonable for OSSAA to believe that use of the majority voting requirement would promote these purposes.[2] Western & Southern Life, 451 U.S. at 668. We readily conclude that

---

[2] The dissent seems to suggest that any constitutional attack on the OSSAA's majority voting requirement must be considered as a due process, rather than an Equal Protection, challenge. We disagree. Because OSSAA's differential treatment of public and nonpublic applicants is manifested exclusively in the majority voting requirement, that requirement is clearly subject to an equal

(continued...)

-20-

OSSAA could not rationally have decided that the majority voting requirement would foster any of these purposes. See Clover Leaf Creamery, 449 U.S. at 466. Although nonpublic schools seeking membership in OSSAA are apparently allowed, as was Christian Heritage, to prepare letters advocating their membership, the voting of existing OSSAA members is ultimately unguided and entirely discretionary. Thus, even where, as here, a nonpublic school seeking membership has taken appropriate steps to ensure that it will not have a competitive advantage over similarly situated public school members of OSSAA, its application can be rejected by existing OSSAA members for any reason, including dislike or distrust. In other words, no standards or restrictions are imposed on existing OSSAA members in casting their votes for or against a nonpublic school's application for admission. As a result, we conclude there is a complete disconnect between the majority voting requirement and the legitimate purposes that OSSAA and we have identified.[3]

---

[2](...continued)
protection challenge.

[3] The dissent concludes that the connection between the State's legitimate interests and the majority voting requirement "is relatively strong." Dissent at 10. In support of this conclusion, the dissent asserts that members schools are well positioned "to determine whether a new applicant is institutionally capable of meeting OSSAA requirements" and "would adversely affect competitive parity." Id. at 11. We note that the record on appeal by no means conclusively supports this assertion. In any event, the critical and uncontroverted fact is that OSSAA imposed no standards, guidelines, or restrictions on its members when they were voting for or against nonpublic school applicants. Indeed, the dissent

(continued...)

-21-

The disconnect between the majority voting requirement and any legitimate

purposes identified by OSSAA is clearly borne out in this case. The record is

replete with evidence, and OSSAA has in fact acknowledged, that OSSAA

members voted against membership applications from nonpublic schools because

of distrust and/or hostility toward nonpublic schools. For example, more than

seventy member schools returned Adams' petition listing five areas where

nonpublic schools supposedly had an advantage over public schools, and

OSSAA's Committee Chairman observed "some strong negative feelings" toward

nonpublic schools and a "consistent theme that placed ALL non-public schools

into an unfavored group status." App. Vol. 3 at 530. Even after the Committee's

Special Report was circulated, OSSAA members refused to admit Christian

Heritage, and they denied its second application for membership by an even

greater margin than its first application. In short, OSSAA's refusal to admit

Christian Heritage was motivated in large part by a dislike for nonpublic schools

generally and Christian Heritage in particular. Such a dislike is not a legitimate

state interest, see Moreno, 413 U.S. at 534 (concluding that a "desire to harm a

politically unpopular group cannot constitute a legitimate governmental interest")

_____

[3](...continued)
acknowledges when addressing Christian Heritage's class of one claim that there
is evidence that members schools were allowed by the OSSAA to vote against
Christian Heritage's applications on the basis of their "subjective ill will." Id. at
15.

(emphasis omitted), and the referendum requirement for nonpublic schools cannot survive rational basis scrutiny. In other words, because there is no connection between the Article III, Section 1, classification and any legitimate government purpose, denying membership to nonpublic schools for failure to garner majority approval is arbitrary and irrational. See Copelin-Brown, 399 F.3d at 1255.

OSSAA urges us to follow Archbishop Walsh High School v. Section VI of the New York State Public High School Athletic Ass'n, Inc., 666 N.E.2d 521 (N.Y. 1996). The plaintiff in Archbishop Walsh, a Catholic high school, sought admission in a state public high school athletic association, but was denied membership based on an insufficient number of favorable votes in a member referendum on its application. Thereafter, the plaintiff filed suit against the defendant athletic association, claiming that the referendum requirement violated the Equal Protection Clause. The Court of Appeals of New York, in a divided vote, affirmed the lower courts' grant of summary judgment in favor of the association. In doing so, the Court of Appeals concluded that the majority voting requirement for admission of a nonpublic school was a "rational screening process." Id. at 522, 525. In addition, the Court of Appeals noted that nothing in the record before it "support[ed] the assertion or speculation that th[e] voting procedure [wa]s intrinsically arbitrary or a subterfuge masking invidious discrimination . . . ." Id. at 525.

As an initial matter, we believe there are several important factual

differences between our case and Archbishop Walsh. In Archbishop Walsh, the defendant athletic association was concerned that nonpublic schools could offer scholarships for athletics and that admitting nonpublic schools would decrease community spirit. No similar concerns are present here. OSSAA rules prohibit the awarding of athletic scholarships and the recruiting of athletes, and these rules apply to all OSSAA members, including nonpublic schools. Further, OSSAA requires nonpublic schools to designate a geographic area to determine eligibility for students, including transfers, and OSSAA classifies schools for sports according to their average daily membership. Lastly, unlike the situation in Archbishop Walsh, the record in our case clearly suggests that the voting on Christian Heritage's membership applications was, at a minimum, arbitrary and, at worst, discriminatory.

Even ignoring these factual differences, we are clearly not bound by, and indeed respectfully disagree with, the majority holding in Archbishop Walsh. In our view, the criticisms of the majority voting requirement expressed by the dissent in Archbishop Walsh are directly applicable here: "[A]s the voting mechanism currently stands, there is no possible way to know whether an applicant was excluded for a reason that would advance the stated goals or for some other discriminatory purpose. Further, the opportunity for mischief in this ballot exercise is apparent, since voting members may use that mechanism as a tool to further their own agendas, discriminatory or not." Id. at 525-26.

-24-

We also reject OSSAA's assertion that this case is analogous to Denis J. O'Connell High School v. Virginia High School League, 581 F.2d 81 (4th Cir. 1978). There, the Fourth Circuit concluded that a public high school athletic association had a rational basis to exclude all nonpublic schools. Id. at 87. The Fourth Circuit reasoned that excluding all nonpublic schools from membership was rationally related to the league's interest in enforcing its eligibility rules concerning transfer students since private schools had no attendance zones, and the league was afraid that admitting them would make it hard to enforce the transfer rule. Id. at 85-86.

In contrast to the league in Denis J. O'Connell, OSSAA's transfer rule applies to public and nonpublic schools, and requires nonpublic schools to designate a geographic area for eligibility purposes. There is no suggestion that OSSAA has had problems enforcing the transfer rule as regards its ten members that are private schools.[4]

In sum, we conclude that OSSAA's majority voting requirement is not rationally related to a legitimate purpose. We therefore conclude the district court erred in denying Christian Heritage's motion for summary judgment and in

---

[4] Had OSSAA decided not to admit any nonpublic schools, that decision likely would be supported by Denis J. O'Connell. However, by choosing to allow nonpublic schools to become members, OSSAA was obligated to ensure that its membership procedures for those schools were consistent with the Equal Protection Clause.

granting OSSAA's motion on these grounds.

*2. Equal Protection challenge to denial of membership applications*

Christian Heritage also challenges OSSAA's denial of its membership applications as violating the Equal Protection Clause. In other words, Christian Heritage claims it has suffered discrimination as a "class of one." Because we have already concluded that Christian Heritage was entitled to summary judgment on its Equal Protection challenge to Article III, Section 1 of OSSAA's Constitution, and because Christian Heritage seeks identical relief on both of its Equal Protection claims, we find it unnecessary to address its "class of one" claim.

## III.

For the reasons discussed above, the district court erred in denying Christian Heritage's motion for summary judgment and granting OSSAA's motion for summary judgment with respect to Christian Heritage's Equal Protection challenge to Article III, Section 1 of OSSAA's Constitution. Accordingly, we **REVERSE** and **REMAND** to the district court with directions to enter summary judgment in favor of Christian Heritage on that claim. On remand, the district

court will determine the appropriate declaratory relief and injunctive relief to which Christian Heritage is entitled.[5]

**REVERSED** and **REMANDED**.

---

[5] On January 11, 2007, OSSAA filed with this court a pleading entitled "Notice of Modification of Requirement That is Subject of Appeal" (Notice). Therein, OSSAA alleged that in November 2006, its existing members approved a new membership rule for nonpublic schools, effective as of July 1, 2007. Under the new rule, OSSAA alleges, a nonpublic school "could become a member of the Association by demonstrating compliance with certain criteria," and without a "majority vote of the existing member schools . . . ." Notice at 2. Christian Heritage responds that OSSAA has provided no explanation how or whether the new rule circumvents Article III, Section 1 of OSSAA's Constitution which requires that "[a]ll other schools must be approved by a majority vote of the existing membership . . . ." Response to Notice at 4. Obviously, the district court will need to consider the new rule and its requirements in the course of fashioning appropriate relief for Christian Heritage.

No. 04-6342, *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*

**McCONNELL**, **J.**, concurring in part and dissenting in part.

The plaintiff's name may suggest this case is about religion, and in a sense that is true. It is about Oklahoma high school football. And there is only one path to the honor and the glory of interscholastic football competition in Oklahoma: membership in the Oklahoma Secondary School Activity Association (OSSAA). Members of the Association enter the promised land of regularly scheduled games with neighboring schools and the prospect of championship competition with the leading teams in the State; those not of the elect are thrown into the outer darkness of few teams to play against and long bus rides to get to them. For public schools, membership in the OSSAA is *sola gratia*: all they have to do is knock, and the door is opened unto them. For nonpublic schools, narrow is the gate and difficult is the way. They may be admitted only according to the inscrutable will of a majority vote. The question is whether this violates the Equal Protection Clause.

I cannot agree with the majority that the OSSAA rule automatically admitting public schools but requiring majority approval for nonpublic schools fails rational-basis review, and I therefore dissent from Part II.B.1. I would reach a similar result, however, by finding that Christian Heritage has suffered discrimination as a "class of one." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000) (per curiam). Christian Heritage has intentionally been

excluded from the OSSAA even as other small nonpublic schools have been admitted. The only reason the OSSAA advanced for this differential treatment, concern over the size of the geographic district chosen by Christian Heritage, is flatly contradicted by the record. Moreover, assuming that a class-of-one claim requires a showing of subjective ill will—a question we need not resolve in this case—summary judgment in favor of the OSSAA was inappropriate because Christian Heritage has submitted evidence from which a reasonable factfinder might conclude that its exclusion from the OSSAA was a product of animus or hostility against nonpublic schools.

I therefore concur in the judgment under a class-of-one theory.[1]

## I.  The Equal Protection Challenge to Requiring Nonpublic Schools to Obtain Majority Support for Admission to the OSSAA

Christian Heritage challenges the OSSAA's disparate treatment of public and nonpublic schools as a violation of the Equal Protection Clause. Public schools can obtain membership automatically by paying a fee and filing any other required reports. Nonpublic schools, by contrast, "must be approved by a majority vote of the existing membership" in addition to satisfying the fee and reporting requirements. OSSAA Const. art. III, § 1(b), App. Vol. 1, at 57.

---

[1]I also agree that Christian Heritage waived its due process argument by failing to brief it on appeal. Because the argument is waived, I do not consider it necessary or appropriate to comment on whether Christian Heritage has "identified a property or liberty interest at stake." *See* Maj. Op. 13.

Because Christian Heritage concedes that nonpublic schools do not form a suspect class and are not otherwise entitled to heightened scrutiny, we apply ordinary rational-basis review, asking whether "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993).

That standard is highly deferential. Under rational-basis review, a classification enjoys "a strong presumption of validity," and the challenging party must negate "'every conceivable basis which might support it.'" *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Because the courts "never insist[] that a legislative body articulate its reasons for enacting a statute," it does not matter whether an asserted rational basis actually motivated the classification. *U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). A classification does not fail rational-basis review merely because it is over- or under-inclusive, lacking "'mathematical nicety.'" *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911)). In other words, a rational classification may be predicated on a generalization, even if that generalization "is subject to exceptions." *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 822–23 (11th Cir. 2004). Finally, we may not "speculate as to whether some other scheme could have better regulated the evils in question." *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004).

The question is whether the classification rationally relates to a legitimate government purpose, not whether it is the best or exclusive means of accomplishing that purpose.

The OSSAA argues that the distinction between public and nonpublic schools serves its interest in "preserving equitable competitive opportunities." Appellee's Br. 23. Surely that is a legitimate state purpose. High school athletic associations exist not only to crown champions, but to further students' educations and their development as individuals. *See* OSSAA Const. art. II, § 2(a), App. 57 (setting forth the objectives of the OSSAA, which include "[t]he promotion of important educational and cultural values, attitudes, appreciations, and skills"). Football and basketball are no fun—and are thus less valuable as an educational and developmental experience—if one school or small group of schools defeats everyone else in competition, year after year. Indeed, the goal of approximate competitive parity has become a driving force even at the professional level. *See* Tom Pedulla, *NFL Dynasties Go "Way of Dinosaurs,"* USA Today, Jan. 24, 2003, at 1A ("For leagues, parity is the holy grail of sports." (internal quotation marks omitted)).

It may be wrong, but it is not irrational, for the OSSAA to believe that nonpublic schools, as a class, enjoy unfair competitive advantages. A petition distributed in March 1998 by a public-school superintendent identified five potential advantages: (1) "Non-public schools['] ability to offer financial aid

-4-

(scholarships)," (2) "Non-public schools['] district size"; (3) "Non-public schools['] student transfer restrictions"; (4) "Non-public schools['] membership audits for verification of OSSAA classification"; and (5) "Percentage of students who participate in OSSAA activities." App. 1137. The record suggests other possible advantages as well, including superior facilities and coaching staffs, selectivity of admissions, grade school athletic programs, parental support, and financing. *Id.* at 535–36.

Whatever the reasons, it is evident that nonpublic schools as a class, in Oklahoma and throughout the country, have a track record of exceptionally strong athletic performance. During the run-up to Christian Heritage's application, Bishop McGuinness Catholic High School, one of twelve nonpublic schools admitted to the OSSAA, won the boys Class 4A basketball championship for four years straight, from 1998 to 2001. Nonpublic schools make up just 2% of the OSSAA's 471 members, but between 1995 and 2003, they won 15% of boys basketball championships, over 20% of boys and girls cross country championships, and a whopping 69% of volleyball championships. During the same period, nonpublic schools also won a disproportionate share of state championships in spring baseball, fast-pitch softball, boys and girls golf, and boys and girls track. A survey of high school athletic associations conducted in 1999 reveals that nonpublic schools have enjoyed similar competitive success in other states: in Indiana, "[p]rivate school[s] win an inordinate number of state

-5-

championships"; in Hawaii, "[b]asically, private schools have been winning more state championships than the public schools"; in New York, "[s]chools are getting frustrated that the Parochial and Private schools are winning our State Championships in many sports"; in South Carolina, "private schools . . . seem to win the state championships"; in Oregon, there has been "friction" due to "increased successes that private schools are having in our state championship." *Id*. at 544–45.

It is not irrational for the public schools that make up the vast majority of OSSAA members to vote for measures designed to ensure that athletic competition in Oklahoma not be dominated by schools that enjoy what they consider to be inherent and unfair advantages. *See Archbishop Walsh High Sch. v. Section VI of the N.Y. State Pub. High Sch. Athletic Ass'n*, 666 N.E.2d 521, 523–24 (N.Y. 1996) (upholding a similar nonpublic school admission rule against an equal protection challenge); *Denis J. O'Connell High Sch. v. Va. High Sch. League*, 581 F.2d 81, 85-88 (4th Cir. 1978) (upholding blanket exclusion of all nonpublic schools from public athletic association).

The majority nonetheless concludes "that OSSAA's majority voting requirement is not rationally related to a legitimate purpose." Maj. Op. 26. It reaches this judgment for essentially two reasons.

First, the majority points to various OSSAA rules prohibiting athletic scholarships and recruiting and requiring transfer students to refrain from

-6-

competition for a year.  *Id.* at 23.  Because these rules effectively counteract the supposed advantages nonpublic schools may enjoy, the majority says, the more draconian remedy of excluding nonpublic schools unless they can summon a majority vote for admission is unnecessary and irrational.  That argument does not warrant a finding of unconstitutionality.

To begin with, the availability of "some other scheme" to address the problem is irrelevant on rational-basis review.  *Powers*, 379 F.3d at 1217.  Even if OSSAA rules better address—or even fully address—the competitive advantages enjoyed by nonpublic schools, that does not make the majority voting requirement irrational.  State actors are free, under the Equal Protection Clause, to adopt blunderbuss procedures rather than narrowly tailored regulations, or to enact redundant policies that serve the same legitimate state purpose.  *See Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976) (per curiam) (acknowledging that by adopting a mandatory age limit of 50 years for uniformed police officers, rather than "individualized testing after age 50," the State "perhaps has not chosen the best means to accomplish [its] purpose," but holding that "where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect'" (quoting *Dandridge*, 397 U.S. at 485)).[2]

_____

[2]The majority distinguishes *Archbishop Walsh*, which is on all fours with
(continued...)

Moreover, there is reason to believe that the OSSAA rules do not fully address the competitive advantages enjoyed by nonpublic schools. OSSAA rules do nothing to rectify imbalances in admissions selectivity, in financing, in facilities or coaching between public and nonpublic institutions. Although some individual OSSAA members may not consider these advantages "unfair," *see* App. 526 (noting that "ability to pay" constrains private-school admissions and that public school districts in "[v]ibrant communities" also provide "donations, support and comparable sacrifices" for athletics), OSSAA as an association is free to reach a different conclusion. It is not irrational for the OSSAA to adopt case-by-case applications as a backstop to generally applicable but difficult-to-police rules.

---

[2](...continued)
this case, on the ground that the OSSAA rules regarding geographic areas, transfers, athletic scholarships, and recruiting eliminate the concerns that underlay the New York rule upheld in that case. *See* Maj. Op. 23-24. This is tantamount to holding that a state athletic association is constitutionally required to adopt a more narrowly tailored rule—a proposition flatly inconsistent with precedents governing rational-basis review. *See Murgia*, 427 U.S. at 316; *Powers* 379 F.3d at 1217. Oddly, the majority distinguishes *Denis J. O'Connell* on the opposite ground that it involved an even less narrowly tailored rule than the OSSAA rule in this case, namely, a blanket exclusion of nonpublic schools. Maj. Op. 25. All three cases—this case, *Archbishop Walsh*, and *Denis J. O'Connell*—involve the same concerns about nonpublic schools, which the majority concedes are rational. Somehow the majority concludes that it is rational to exclude all nonpublic schools, and rational to adopt rules designed to eliminate the supposed unfair advantages of nonpublic schools, but irrational to adopt the intermediate course of subjecting the admission of nonpublic schools to a majority vote. I find these distinctions wholly unconvincing.

Second, the majority asserts that the member-voting procedure is "complete[ly] disconnect[ed]" from any legitimate purpose OSSAA may be trying to achieve. Maj. Op. 21. The majority opinion complains that "there is no possible way to know [in a referendum voting system] whether an applicant was excluded for a [valid] reason . . . or for some other discriminatory purpose." Maj. Op. 24 (quoting *Archbishop Walsh*, 666 N.E.2d at 525 (Titone, J., dissenting)). This argument, however, pertains most directly to due process rather than equal protection, and the plaintiffs failed to preserve their due process claim. The U.S. Supreme Court has in other contexts questioned policy enforcement through referendum voting—but as a due process problem. And it is worth noting that the Court ultimately found the mechanism constitutionally valid. *City of Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 675 (1976) (rejecting contention that a citywide referendum on zoning laws constituted a deprivation of due process because "voters were given no standards to guide their decision" and "no mechanism existed, nor indeed could exist, to assure that the voters would act rationally"). Recast as an equal protection claim, the majority's argument sweeps too broadly. If a voting mechanism is completely disconnected from legitimate state ends simply because we cannot be sure why voters make the decisions they do, *no* vote by secret ballot will survive rational-basis review in an equal protection challenge.

Surely the majority does not mean to suggest that referenda are per se irrational. Perhaps it means, instead, that given the potential for abuse, final OSSAA approval ought not to have been entrusted to public schools, which have a vested interest in the outcome. Yet this too is a due process rather than an equal protection argument. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986) (holding that the Due Process Clause bars trial by potentially biased judges); *Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 60 (1972) (elaborating the due process test for bias); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (trial by judges who have a "direct, personal, substantial pecuniary interest" in the case violates the Due Process Clause). In any event, whether the state has adopted the best possible means of enforcing its policy is not the issue before us. *Powers*, 379 F.3d at 1217. We must determine whether the enforcement mechanism selected bears some rational connection to the state interest at issue. Given that the State may refuse to admit nonpublic schools automatically, Maj. Op. 14, *someone* must decide for each nonpublic applicant whether admittance is appropriate. Some person or group of persons must vote. Perhaps the State was unwise to entrust that vote to the majority of OSSAA members, but there is hardly a "complete disconnect" between the majority voting requirement and the State's legitimate interests.

Indeed, the connection is relatively strong. Member schools are familiar with the actual operation of the OSSAA guidelines: they must implement the rules

day-to-day. Moreover, they are familiar with the competitive balance among member schools at any one time. They arguably are therefore better positioned than an OSSAA staff employee, for example, or any other person lacking hands-on experience administering OSSAA's rules, to determine whether a new applicant is institutionally capable of meeting OSSAA requirements. They are also well suited to judge whether a new entrant would adversely affect competitive parity. True, this exercise of discretion by member schools is, like all exercises of discretion, open to abuse. But that potential for abuse does not render the voting mechanism as a whole irrational.

Besides the problems inherent in referendum voting, the majority contends that the OSSAA voting requirement is irrational for another reason—because many OSSAA member schools harbor an irrational "distrust" or "hostility" towards nonpublic schools. Maj. Op. 22. The majority points to the fact that even after Christian Heritage submitted a revised application responding to the supposed concerns of member schools, the Association denied Christian Heritage admittance a second time. *Id*. But this fact, though admittedly troubling, does not impugn the rationality of the voting mechanism. Instead, it calls into question the treatment Christian Heritage received relative to other similarly situated applicants. Put another way, it suggests the Association discriminated against the plaintiff as a class-of-one. But a class-of-one allegation constitutes a separate claim and necessitates a separate inquiry. The only question here is whether the

-11-

OSSAA's majority-voting requirement, on its face, rationally serves a legitimate public purpose. *W.& S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 668 (1981). Because I believe that the answer is "yes," I would affirm the judgment of the district court rejecting the challenge to OSSAA voting procedures.

## II. The Class-of-One Challenge to Christian Heritage's Rejection as a Member of the OSSAA

Although I cannot regard as irrational the OSSAA's decision to require nonpublic, but not public, schools to obtain majority support for admission to the Association, I would hold that Christian Heritage Academy has submitted evidence from which a reasonable jury could infer that its exclusion from the Association violates the Equal Protection Clause, as interpreted by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam).

Having decided to admit at least some nonpublic schools to the OSSAA, the organization must have a lawful and rational basis for its decisions. The OSSAA is an agency of the state, *see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001), and therefore cannot grant or withhold the privilege of participating in the public benefit of its programs on an arbitrary or invidious basis. As an arm of the state, the OSSAA cannot pick and choose its members like a fraternity or a private club.

Under the Supreme Court's opinion in *Olech*, 528 U.S. at 564, a plaintiff may state a "class of one" equal protection claim by alleging that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." The OSSAA has admitted other nonpublic schools that are materially identical to Christian Heritage: of similar size, located in comparable suburban areas, and—so far as the record discloses—sharing the same competitive advantages as other nonpublic schools. The only reason for this differential treatment offered by the OSSAA, both in its brief and under persistent questioning at oral argument, is that members may have harbored concerns about the geographic district identified in Christian Heritage's application.

Two factors undercut this explanation. First, the OSSAA has admitted comparable nonpublic schools, both in urban and suburban areas, with identical or even larger geographic districts. Second, after its 1998 application was defeated by a vote of 153-184, Christian Heritage attempted to address members' concerns by shrinking its proposed geographic district. Yet its 1999 application was defeated by an even more lopsided vote of 113-188. Far from explaining the decision, Christian Heritage's geographic district tends to show that the exclusion was arbitrary. With no other explanation offered by the OSSAA, *see Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1211 n.4 (10th Cir. 2006) (declining to consider a possible rational justification in a class-of-one case where

the defendants did not raise it in court), it appears that Christian Heritage has been "intentionally treated differently from others similarly situated" without any rational basis. I therefore would reverse the judgment of the district court granting summary judgment for the OSSAA.

There is (or has been) uncertainty in this and other courts over whether the plaintiff in a class-of-one equal protection suit must show that its discriminatory treatment was motivated by some form of subjective malice, vindictiveness, or ill will, in addition to being arbitrary and irrational. *See Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004) (describing but not resolving the issue). The Supreme Court in *Olech* held that allegations of "irrational and wholly arbitrary" action state a claim under a class-of-one theory, "quite apart from the Village's subjective motivation." *Olech*, 528 U.S. at 565 (internal quotation marks omitted). It therefore declined to consider the role that "subjective ill will" might play in a class-of-one claim. *Id.* (internal quotation marks omitted). In a separate opinion, not commanding a majority, Justice Breyer concurred specifically on the ground that the plaintiffs alleged that the defendants took "vindictive action" resulting from "illegitimate animus" and "ill will." *Id.* at 566 (Breyer, J., concurring) (internal quotation marks omitted). On two occasions, this Court has adopted Justice Breyer's suggestion and has rejected class-of-one claims in the absence of evidence of subjective ill will. *MIMICS, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 848–49 (10th Cir. 2005); *Bartell v.*

-14-

*Aurora Pub. Sch.*, 263 F.3d 1143, 1148–49 (10th Cir. 2001).[3]

On the facts of this case, it is not necessary to wade into this doctrinal morass. Christian Heritage has raised a genuine issue of material fact as to whether the denial of its applications for membership in the OSSAA was motivated by subjective ill will. Various OSSAA reports indicate that its members harbored "strong negative feelings" toward nonpublic schools, and "placed ALL non-public schools into an unfavored group status." App. 530. One document explicitly suggests that "bias and prejudice" might have motivated opposition to nonpublic schools' admission. *Id.* Whether or not these statements are tantamount to party admissions, as Christian Heritage claims, they serve as

---

[3]Other courts of appeals have divided on the question. One circuit appeared to reject a requirement of subjective ill will, *see Jackson v. Burke*, 256 F.3d 93, 97 (2d Cir. 2001) (per curiam) ("To be sure, proof of subjective ill will is not an essential element of a 'class of one' equal protection claim."), but has since called its early statements "merely dicta" and determined that the question remains open, *Bizzarro v. Miranda*, 394 F.3d 82, 88 (2d Cir. 2005). Another has explicitly construed *Olech* as requiring subjective animus, *see Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) ("gloss[ing]" *Olech* as requiring animus), although subsequent panels have attempted to change course, *see Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 683–84 (7th Cir. 2005) (noting competing lines of cases within the circuit and reserving the question). Two courts of appeals have adopted an approach similar to that of the majority, recognizing two or three types of class-of-one claims, only one of which requires subjective ill will. *See Mikeska v. City of Galveston*, 451 F.3d 376, 381 & n.4 (5th Cir. 2006); *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County*, 430 F.3d 783, 788 (6th Cir. 2005). *But see Shipp v. McMahon*, 234 F.3d 907, 916 (5th Cir. 2000) (holding that *Olech* requires "illegitimate animus or ill-will"), *overruled in part on other grounds*, *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (en banc).

-15-

sufficient evidence at summary judgment to allow a jury to conclude that ill will or vindictiveness actually motivated the decision. Thus we need not resolve whether subjective ill will is an essential element of a class-of-one claim; Christian Heritage prevails under any formulation. The best course, I think, is to follow our decisions in *Jicarilla* and *Jennings* by reserving the question for a case in which the outcome actually matters. *See Jicarilla*, 440 F.3d at 1210 (holding that "it is not necessary to resolve" whether animus is "a *necessary* condition for a class-of-one claim" because "it is not a sufficient one"); *Jennings*, 383 F.3d at 1211–12 (noting that the plaintiff "could not prevail" if subjective ill will is required, but "not rest[ing] our decision on that ground").

### III. Conclusion

I **CONCUR** in the reversal of the district court's grant of summary judgment to the OSSAA. I respectfully **DISSENT** from the equal protection analysis of Part II.B.1 which culminates in a grant of summary judgment for Christian Heritage. Instead, I would remand to the district court for further proceedings on Christian Heritage's class-of-one claim.